**FLAME CUT STEEL PRODUCTS CO., INC., Plaintiff,**

v.

**PERFORMANCE FOAMS COATINGS, INC. and Premium Polymers, Inc., Defendants.**

No. Civ.A.97–CV–3266(DGT).

United States District Court, E.D. New York.

April 26, 1999.

Demetriou & Demetriou, Garden City, NY, for plaintiff.

Patterson, Belknap, Webb & Tyler, LLP, New York City, for defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Defendant Premium Polymers, Inc. ("Premium") renews its motion for summary judgment against plaintiff Flame Cut Steel Products Co., Inc. ("Flame Cut"). Premium's motion for summary judgment was previously denied with leave to renew at the conclusion of discovery.

### Background

#### (1)

On October 1, 1995, defendant Performance Foams & Coatings, Inc. ("Performance"), a New Jersey roofing and construction company, entered into a contract to re-roof plaintiff Flame Cut's facility on Bedford Avenue in Brooklyn, New York, for a price of $29,232.00. Performance and Flame Cut agreed that Performance would use a coating product that is produced by defendant Premium, a Texas corporation with its principal place of business in Austin, Texas. The last sentence of the roof construction contract states:

> Upon completion and payment in full, Premium Polymers, manufacturer, will issue you their ten year no leak warranty.

Falco Aff., Ex. A. The contract contains no other express warranties. On October 18, 1995, Performance contacted Premium and placed an order for the coating product, the cost of which was $9,620.00. During the course of re-roofing Flame Cut's facility, Performance applied the Premium coating product to Flame Cut's roof. The product was applied by Performance employees, and no evidence has been brought forward showing that any Premium personnel or representatives were present during the re-roofing process or the application of the Premium product to the roof. Performance completed the re-roofing of Flame Cut's roof in October 1996.

The new roof was, unfortunately, a leaky one. Flame Cut has received an estimate of $100,000 for the cost of repairing the roof. *See* Mem. of Pl. Flame Cut Products Co., Inc. in Opp. to Def.'s Mot. for Sum. J. ("Plaintiff's Memorandum I"), Ex. A. Flame Cut made many requests of Performance and of Premium to repair the roof. *See* Falco Aff., ¶ 8. When these requests proved unsuccessful, Flame Cut commenced the present litigation. It brought a claim against Performance for $100,000, arguing that negligent construction work by Performance resulted in the leaky roof. Flame Cut also brought a claim against Premium for $100,000 for breach of an express warranty and on an agency theory. *See* Plaintiff's Memorandum I, at 3. A default judgment was entered by this court against Performance on July 14, 1997, for $100,000 plus interest, costs and disbursements.

#### (2)

In addition to the roof construction contract, Flame Cut and Premium have of-

fered as evidence in support of their arguments several other documents that are relevant to the relationships among the parties and to the facts of this case. One is an advertisement put out by Performance and seen by Flame Cut prior to its hiring of Performance. *See* Falco Aff., Ex. A. The advertisement contains the following statement, printed in a pattern in which the names of companies appear in their respective graphically-designed logos:

*PERFORMANCE*

FOAMS & COATINGS, INC.

is an approved applicator for and proudly recommends:

PREMIUM *STAYTEX* URYLON

POLYMERS

Nowhere else in the advertisement does Premium's name appear.

Another relevant document is a contract between Premium and Performance, dated September 19, 1995, and titled "Authorized Roofing Applicator Agreement."[1] Def. Premium's Resp. to Pl.'s First Set of Interrogs., Ex. 2 ("Applicator Agreement"). This contract is apparently a standard form contract used by Premium. The name and address of Performance are handwritten on the front of the contract, and Performance is referred to in the document as "Applicator." At the heart of this agreement is a grant by Premium to Applicator of a "non-exclusive right to purchase and install Premium Polymers Roofing Systems ... consisting of all roofing products now or hereafter marketed by Premium Polymers." Applicator Agreement, ¶ 1(a). It has emerged in discovery

that Premium accepts applications from roofing specialists to become Applicators and that it does sign Applicator Agreements with other specialists. *See* Def. Premium's Resp. to Pl.'s Request for Admissions, ¶¶ 4, 5.[2]

Although at a pre-motion hearing Premium's counsel asserted that "[t]hey do not train anyone," Tr. 4/17/98, at 17, the Applicator Agreement does provide that Premium shall "[p]rovide Applicator with instructional materials, instructions and training which in Premium Polymers' judgment are necessary to assure adequate quality and uniformity in installation." Applicator Agreement, ¶ 3(a). Premium may, at its discretion, "furnish Applicator without charge technical assistance and advice for the purpose of evaluating watertight integrity." Applicator Agreement, ¶ 3(d). Applicator may request a grant of "Premium Polymer's Limited Warranty" to Applicator's customer, but Premium may refuse to issue a warranty if its installation instructions are not followed or if it has not been paid. Applicator Agreement, ¶ 3(c). Among other things, Applicator is required to use its best efforts to promote Premium products, attend training meetings, and follow instructions on installing Premium products. Applicator Agreement, ¶ 2.

Finally, the Applicator Agreement provides that Applicator is not and shall not hold itself out as being Premium's agent. Applicator is permitted, however, to advertise itself as a "Premium Polymers Authorized Roofing Applicator." Applicator Agreement, ¶ 8.[3]

---

1. In the parties' memoranda and other papers and documents presented, Performance is variously referred to as an "approved," an "authorized," or a "qualified" applicator. It appears that these titles all refer to the same role of Performance and its relationship with Premium.

2. It has also emerged in discovery that Premium sells its products to the general public in the United States. Such sales come with product warranties warranting only that the product is itself free of defects. *See* Def.

Premium's Resp. to Pl.'s First Set of Interrogs., ¶ 18.

3. The Applicator Agreement contains the following statement:

8. Relations Between Parties

(a) Applicator shall not use the name Premium Polymers ... in Applicator's firm name or assumed name or in any other manner, provided, however, Applicator may indicate in correspondence or advertising ... that it is a Premium Polymers Authorized Roofing Applicator....

The next relevant document is the warranty which Premium issued for the use of its product in the Flame Cut roof construction job. *See* Plaintiff's Memorandum I, Ex. B ("Premium Product Warranty"). This warranty is titled, "Premium Polymers, Inc. 5 + 5 Year Limited Warranty: 5 Year No Leak Product Warranty With Optional Extension to 5 Years," and was issued on August 1, 1996. Flame Cut did not, however, receive a copy of this warranty until after the commencement of litigation. In the warranty, Premium warrants that no leaks will occur as a result of a deterioration of its product under "ordinary weather conditions." If such leaks do occur, the warranty limits damages to the supply of the product. *See* Premium Product Warranty, ¶ A.[4] The warranty also states:

> C. This Warranty does not cover failure of the product due to:
>
> . . .
>
> 3. Damage to the product resulting from cracks or openings in the roof substrate.

(b) Applicator shall act only in Applicator's legal capacity as an independent contractor. In no event shall Applicator be an employee, franchisee or agent of Premium Polymers. Premium Polymers is not a franchiser. Applicator has no authority to act for, on or [sic] behalf of Premium Polymers or to bind Premium Polymers in any way whatsoever, and Applicator shall not so hold itself out to anyone or otherwise represent that Applicator has such authority. Applicator is not authorized to make or extend any promises, representations or warranties with respect to Roofing Systems except as set forth in Premium Polymers' product literature or specifications.
Applicator Agreement, ¶ 8.

4. The Premium product warranty states:

A. Premium Polymers . . . warrants to the Building Owner (Owner) that . . . said roof structure will not leak water due to deterioration of any product manufactured and marketed by Premium Polymers . . . as the result of ordinary weather conditions. If deterioration should occur under ordinary weather conditions resulting in a leak in the roof system, Premium agrees to supply to

4. Deficiencies in any non-Premium product or in its application, improper preparation or defects in the substrate, errors in the roofing system, or any other latent defects.
Premium Product Warranty, ¶ C(3), (4).[5]

There is also a four page brochure disseminated by Premium to the public. Mem. on Behalf of Pl. Flame Cut Steel Products Co., Inc. in Opp. to Renewed Mot. by Def. Premium Polymers, Inc. for Sum. J. ("Plaintiff's Memorandum II"), Ex. D. The last section of the last page of this brochure contains the following statements:

Service & Support

. . .

> As a nationwide organization, Premium Polymers has seven distribution centers throughout the country and representation in all 50 states, for quick, efficient response to customer needs.
>
> A network of highly·skilled roofing professionals is responsible for installing Premium systems. Each contractor must meet stringent quality, mechanical,

the Qualified Applicator at no charge, all Premium product needed to repair said leak. . . . This shall be the exclusive remedy of the Qualified Applicator ·and Owner in the event of a breach of the foregoing Warranty by Premium.
Premium Product Warranty, ¶ A.

5. Two other types of warranties, available from Premium, are listed in the Premium Contractor's Manual. A Premium "Product" warranty "warrant[s] products to be free of defects at the time of sale and to meet public physical properties when applied, cured and tested ... Premium solely· is limited to replacement of any product shown to be defective." Alexeev Dep., p. 73 (quoting Premium Contractor's Manual). The third type of warranty is a limited "Systems" warranty: "Premium warrants to the building owner that for a specified period of time from the date of completion, said structure will remain free of water leaks due to deterioration of any components of the membrane system as the result of ordinary weather conditions. Premium will, at its own expense, make such repairs as may become necessary to repair said water leak into the structure." *Id.* at pp. 73–74.

and financial guidelines to be approved to install Premium systems.

These professionals are backed by a knowledgeable team of roofing experts and polymer engineers who analyze each project individually. This attention to detail allows Premium to offer some of the most comprehensive warranties in the industry, including the revolutionary Premium Partnership Program.

Plaintiff's Memorandum II, Ex. D. Flame Cut, however, does not claim to have seen this brochure prior to hiring Performance.

### (3)

Premium and Flame Cut have retained experts to review and report on the causes of the leaks. Hobbie Aff., Ex. B (Premium's Expert Report) and Hobbie Aff., Ex. C (Flame Cut's Expert Report). Premium's expert concluded that "the reported leaks are the result of distress and deterioration of the exterior masonry, original built-up roofing, and the metal/glass window system." Premium's Expert Report, Conclusions. Flame Cut's expert found as follows:

We determined the urethane foam roof system is not waterproof by itself. The gravel on top of it certainly will not stop the water. If the foam had a sealant applied, the water would have been shed from the building instead of entering the building.

The edges of this roof are coated with a spray waterproofed coating. This makes the foam waterproofed in these areas, [sic] however, where the foam attaches to the flashing in several areas it is open allowing water to enter. If deck and walls were primed this would not occur.

. . .

This roof was never installed properly from the beginning. The old gravel according to good roofing practice should have been removed and then the deck primed, so that the urethane foam would adhered [sic] to the roof deck. During our examination we observed that this gravel was not primed, therefore creating a void between the old roof and the new roof.

Flame Cut's Expert Report.

### Discussion

#### (1)

Plaintiff Flame Cut argues for its claim against defendant Premium on the basis of two different theories: breach of an express warranty and agency. The breach of warranty claim is based on the Premium product warranty issued by Premium on August 1, 1996. New York law requires that the warranty in question have been broken in order to sustain a breach of warranty claim. *See Penna v. Nat'l Gypsum Co.,* 125 A.D.2d 1008, 510 N.Y.S.2d 401 (4th Dept.1986) (affirming dismissal of complaint for failure to allege any breach of the terms of the guaranty). It is a simple principle of commercial law that "[i]n an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." N.Y. U.C.C. § 2–314, cmt. 13 (McKinney 1993).

In this case, a claim based on the Premium product warranty must fail. In the Premium product warranty, Premium warranted only that no deterioration of its product caused by ordinary weather conditions would result in a leak. Flame Cut has not brought forward any evidence showing that it was the ordinary deterioration of the Premium product that caused the damage to the roof. To the contrary, Flame Cut's own expert seems to have concluded that leaks in the roof were caused by the improper construction of the roof and perhaps also by the improper application of the Premium product. But Premium's warranty explicitly excludes from its coverage any failure of its product that is caused by "[d]eficiencies in any non-Premium product or in its application, improper preparation or defects in the

substrate, errors in the roofing system, or any other latent defects." Premium Product Warranty, ¶ C(4). Flame Cut has not offered and seems unable to offer concrete evidence that Premium has breached its warranty.

### (2)

Flame Cut also argues that a breach of warranty claim against Premium arises from the statement by Performance in the roof construction contract that "Premium Polymers, manufacturer, will issue you their ten year no leak warranty." Falco Aff., Ex.A. Moreover, Flame Cut contends that the ten year no leak warranty, unlike the Premium product warranty, is unqualified in its guaranty that there simply will be no leaks. Plaintiff's Memorandum I, at 3. Flame Cut further asserts that the ten year no leak warranty is a "systems" warranty that, in the event of a leak, covers not only the cost of providing replacement roof coating product, but also the total cost of any repairs necessary to restore the roof to a leak proof condition.

As a threshold matter, there is some ambiguity as to which warranty Performance believed that it was offering. It appears that Performance, when it referred to the "ten year no leak" warranty, may well have been referring to the express five year no leak product warranty with optional five year extension discussed above. *See* Premium Product Warranty, ¶ C(4). It is equally apparent that if the "ten year no leak" warranty is the same express warranty discussed above, or contains similar terms, plaintiff's breach of

warranty claim on the agency theory must fail. In that case, even if Performance were found to be Premium's agent, the warranty would not cover the damage caused by the leaky roof. However, if what Performance offered, or appeared to be offering, was a systems warranty, the cost of repairing and replacing the damaged roof could still be recovered by Flame Cut under an agency theory.[6]

Significantly, a systems warranty could not issue without the submission to Premium, by the contractor, of "notice of award" and "notice of completion" documentation. Alexeev Dep., pp. 41–42. Moreover, it appears that inspection, by Premium personnel, of the roof treated with the Premium coating product was necessary before a systems warranty could issue, Alexeev Dep., pp. 41–42, 68, 80; Tr., dated 4/17/98, pp. 14–15, though whether such inspections were, in fact, conducted remains an unasked and unanswered question.[7] Construing the facts in the light most favorable to plaintiff, as one must do on this motion for summary judgment, it must be assumed that plaintiff believed that it was being offered a systems warranty.

The soundness of plaintiff's agency claim, therefore, depends on whether Premium can be bound by the actions of Performance in putting this statement into its roof construction contract. Even if Flame Cut believed that the statement in the Performance roof construction contract means what Flame Cut says that it does, however, Flame Cut's argument merely begs the question whether Performance

---

**6.** Performance's principal made clear at deposition that, although he had been involved in offering "a few" systems warranties to customers, the "ten year no leak" warranty that he offered in this case to Flame Cut was a products warranty. Alexeev Dep., pp. 64, 70, 80–81, 85. It may, however, have appeared to Flame Cut that it was being offered a systems warranty.

**7.** Only reluctantly did counsel for Premium even admit to the existence of a warranty in which Premium "warrant[ies] work of the contractors." Tr., dated 4/17/98, p. 14. Ac-

cording to Premium's counsel, the Premium systems warranty, unlike its products warranty, involves "a more expensive contract, more expensive product," and the presence of Premium's representatives "on site during the whole process." *Id.* at 14–15. Although additional evidence concerning how Premium issued systems warranties may have proved helpful to plaintiff in establishing its agency theory, plaintiff chose not to depose any of defendant's officers or employees, despite being given the opportunity to conduct additional discovery on the agency issue.

could bind Premium to the responsibilities of a systems warranty. Premium rightly protests that it was not, after all, a party to the Performance construction contract, and Flame Cut has offered no evidence that Premium signed or acknowledged this contract. A claim arising out of the alleged, unqualified "no leak" warranty in the Performance roof construction contract may not proceed, therefore, unless Flame Cut first shows that Performance was Premium's agent and had the actual, whether express or implied, or the apparent authority to bind Premium to such a warranty when Performance wrote and signed the roof construction contract and when it performed the construction work.

### (3)

■ Under New York law, an agent's authority may be express, implied or apparent. *See Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146, 606 N.Y.S.2d 243, 246 (2d Dept.1993). Authority that is express or implied "arises from a manifestation of consent from principal to agent. Such consent can be either express or implied from 'the parties' words and conduct as construed in light of the surrounding circumstances.'" *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc.*, 758 F.Supp. 908, 919 (S.D.N.Y.1991) (quoting *Riverside Research Inst. v. KMGA, Inc.*, 108 A.D.2d 365, 370, 489 N.Y.S.2d 220, 223 (1st Dept.1985)) (other citations omitted), *reh'g denied*, No. 88 Civ. 2719, 1991 WL 167974 (S.D.N.Y. Aug. 22, 1991).

■ Flame Cut points to no evidence that shows either that Premium consented to Performance acting as its agent or that Performance was led to believe that it was Premium's agent. To the contrary, the Applicator Agreement explicitly rules out an agency relationship. Thus, Flame Cut cannot demonstrate that an agency relationship existed between Performance and Premium which granted Performance either express or implied authority.

An alternative basis for a claim on an agency theory is apparent authority. Under New York law:

> Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority. "Rather, the existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal—not the agent." Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable.

*Hallock v. State*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513–14, 474 N.E.2d 1178 (1984) (quoting *Ford v. Unity Hosp.*, 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659 (1973), and citing Restatement (Second) of Agency § 8, cmt. c (1958)) (other citations omitted). In order to support an argument of apparent authority, Flame Cut must show that some conduct on the part of Premium led to a reasonable belief on Flame Cut's part that Performance was Premium's agent.

Flame Cut, in its memorandum and initial submissions to the court, referred to several pieces of evidence in support of its apparent authority theory:

(1) the existence of the Applicator Agreement between Performance and Premium;

(2) the references in the Applicator Agreement, in the Premium product warranty and in other documents (other than the Performance advertisement) to "approved," "authorized," or "qualified applicator;"

(3) the indemnification provision in the Applicator Agreement;

(4) the provision in the Applicator Agreement for training and technical support for Applicator;

(5) the provision in the Applicator Agreement for notice given to Premium of jobs on which Applicator installs Premium products;

(6) the provision in the Applicator Agreement for inspection by Premium of the installation of Premium products;

(7) the requirement that a prospective qualified Applicator submit to Premium an application which includes company financial information;

(8) statements in the Premium brochure to the public regarding the service and support it provides to its contractors;

(9) the provision in the Applicator Agreement whereby Performance may advertise itself as a "Premium Polymers Authorized Roofing Applicator" and the appearance of the title, "approved applicator" in the Performance advertisement;

(10) the provision in the Applicator Agreement whereby Performance may, with Premium's permission, offer its customers Premium's warranties. *See* Plaintiff's Memorandum II, at 3–6, 8 (evidence listed here in an order different from plaintiff's organization).

 Most of the pieces of evidence to which Flame Cut refers were not available to it when it hired Performance and, thus, they could not have led Flame Cut to believe that Performance was Premium's agent. Items (1) through (8) of the above list involve elements of documents which Flame Cut did not see: the Applicator Agreement, the Premium product warranty, and the Premium brochure. Moreover, none of the critical statements cited by Flame Cut were communicated to it either directly or indirectly, and it could not have relied on them in any sense. No apparent authority, therefore, could arise from these pieces of evidence.

Only two pieces of evidence to which Flame Cut initially referred (items (9) and (10)) could even arguably be said to suggest some conduct on Premium's part that was observed and relied upon by Flame Cut. First is the fact that in the Applicator Agreement, Premium encouraged Performance to promote Premium products and permitted Performance to advertise itself as a "Premium Polymers Authorized Roofing Applicator." The second is the provision in the Applicator Agreement whereby Performance is able, with Premium's consent, to pass Premium warranties on to its customers. This is the bare outline of an apparent authority claim. Premium did permit the use of an allegedly suggestive title in advertising, and it did allow for the passing on of its warranties. Flame Cut did, in fact, see the Performance advertisement and was promised a Premium warranty by Performance. The question remains, with regard to these two facts, whether Flame Cut's belief that it was being promised some sort of a "ten year no leak" systems warranty was reasonable.

The question of the existence of apparent authority is normally a question of fact and its resolution on a motion for summary judgment is often considered inappropriate. *See Minskoff v. Am. Express Travel Related Servs. Co., Inc.,* 98 F.3d 703, 708 (2d Cir.1996) (citing *Herbert Constr. Co. v. Continental Ins. Co.,* 931 F.2d 989, 994 (2d Cir.1991)); *Cooperative Agricole Groupement De Producteurs Bovins De L'Ouest v. Banesto Banking Corp.,* No. 86 Civ. 8921, 1989 WL 82454, at *16 (S.D.N.Y. July 19, 1989), *aff'd,* 904 F.2d 35 (2d Cir. 1990); *Stanford v. Kuwait Airways Corp.,* 648 F.Supp. 1158, 1162 (S.D.N.Y.1986). Nevertheless, where there was insufficient evidence under New York law to support a finding of apparent authority, courts have found on a motion for summary judgment that no apparent authority existed. *See Royal Indus. Ltd. v. Kraft Foods, Inc.,* No. 94 Civ. 9334, 1998 WL 67671 (S.D.N.Y. Feb.18, 1998), *aff'd,* 164 F.3d 619 (2d Cir. 1998); *Carte Blanche,* 758 F.Supp. 908; *Aries Ventures Ltd. v. Axa Finance S.A.,* 729 F.Supp. 289 (S.D.N.Y.1990) (finding no

apparent authority in one relationship but denying summary judgment as to other agency theories); *Cooperative Agricole,* 1989 WL 82454, at 16; *Stanford,* 648 F.Supp. 1158, 1162 (granting summary judgment to one of the defendants). New York courts have also held that "when . . . the facts are not disputed, the question of agency should be resolved by the court." *Plymouth Rock Fuel Corp. v. Leucadia, Inc.,* 100 A.D.2d 842, 474 N.Y.S.2d 79, 81 (2d Dept.1984) (citing *Hedeman v. Fairbanks, Morse & Co.,* 286 N.Y. 240, 248, 36 N.E.2d 129 (1941)).

■ Flame Cut claims to have inferred an agency relationship when it saw the term, "approved applicator" in Performance's advertisement. Although Premium had authorized Performance's use of that term, in the same advertisement, Performance stated that it was also an approved applicator for two other companies. It would be an extremely strained argument, at best, that the use of this term could reasonably give a reader the impression that Performance was Premium's agent. The context suggests the opposite; Performance is not an agent for Premium, but merely uses Premium's products as well as those of other companies. Moreover, such statements are not unusual in advertising and could not, on that basis alone, reasonably be found by a jury to create an agency relationship.

■ Flame Cut also argues that the authority of Performance, with Premium's consent, to pass on Premium warranties could reasonably lead Flame Cut to believe that Performance had Premium's authority to grant Flame Cut a "ten year no leak" systems warranty. This belief was unreasonable for three reasons. First, the extension of manufacturer's warranties through dealers to customers is a widespread practice in commercial life. A reasonable customer does not normally infer from the receipt of a manufacturer's warranty from a dealer that the manufacturer is responsible for the dealer's oral representations describing the manufacturer's warranty. In this case, moreover, the manufacturer's warranty did not issue immediately upon purchase. And yet, even in the common case in which the warranty does issue immediately, customers understand the difference between a promise made by the dealer and one made by the manufacturer.

Second, and even more relevant is that we are here dealing with a construction contract. No one reasonably expects to look to the manufacturer of construction materials whom one has never seen, let alone dealt with, to guarantee the quality of an independent contractor's installation work. Thus, in the present case, it would have been unreasonable for Flame Cut, which was dealing only with Performance, and not with Premium, to expect that Premium would have issued a systems warranty, covering the costs of making repairs or replacing an entire roof, without even inspecting the roof following the application of Premium's coating product, and for no additional cost to boot. And third, although Flame Cut emphasizes the importance of the "no leak warranty" statement in the contract it had with Performance, Flame Cut provided no evidence in its initial submissions that this statement involved any action on Premium's part. Indeed, there was no evidence showing that Premium was even aware that such a statement was being made by one of its qualified applicators.

At oral argument on defendant Premium's motion for summary judgment, I concluded that Flame Cut had not brought forward any evidence or arguments which would show that any conduct on the part of Premium could have led Flame Cut to a reasonable belief that Premium appeared to have appointed Performance as its agent for granting a "ten year no leak" systems warranty. Nonetheless, Flame Cut was granted permission to conduct the deposition of Michael Alexeev, the principal of defendant Performance. Flame Cut contends, based upon Alexeev's deposition testimony, that Premium authorized Per-

formance: to tell its customers that "upon completion and payment in full," Premium would "issue [its] ten year no leak warranty"; and to offer and include the "ten year no leak" warranty in its contracts with its customers, and that, therefore, Premium created in Performance the appearance of authority to bind Premium to such a broad warranty. Pl.'s Let. in Opp. to Mot. for Sum.J., dated 3/22/99. Despite plaintiff's assertion to the contrary, these statements are merely duplicative of evidence already submitted by Flame Cut and, thus, do not assist Flame Cut in meeting its burden as non-movant on a motion for summary judgment. *Compare* Alexeev Dep., pp. 19, 41, *with* Falco Aff., Ex. A.

There does appear to have been misleading conduct in this case. A warranty was misstated to Flame Cut. But, again, this was the action of Performance, not of Premium. With regard to this conduct as well as to the quality of the construction job, Flame Cut's complaint is against Performance, and not, on the basis of this record, against Premium. Flame Cut has not brought forward any evidence of any words or conduct on Premium's part that clothed Performance with the apparent authority to issue the warranty that Flame Cut believed it was getting, or from which Flame Cut could reasonably have believed that Premium had authorized Performance to issue such a broad-gauged warranty.

### (4)

The parties have disputed two other legal issues. First, defendant Premium has argued and plaintiff Flame Cut has disputed that a limitation of Flame Cut's damages to the amount provided for in the Premium product warranty would be appropriate if summary judgment is not granted. Second, Premium has argued and Flame Cut has disputed that the Premium product warranty's provision designating that the warranty should be interpreted according to Texas law should be enforced. Premium has not made clear that the choice of Texas law would affect the soundness of claims in this case. Since

the motion for summary judgment is granted, there is no need to reach these issues.

### Conclusion

For the reasons discussed above, the defendant Premium Polymers, Inc.'s motion for summary judgment is granted. Previously, Performance failed to answer and a default judgment was entered against it. The Clerk of the Court is directed to enter judgment accordingly and close the case.

SO ORDERED.