PAUL T. FREUND CORP., Plaintiff,

v.

COMMONWEALTH PACKING COMPANY, Victoria's Secret Stores, Inc., Defendants.

Victoria's Secret Stores, Inc., Counterclaimant,

v.

Paul T. Freund Corp., Counterdefendant.

No. 00–CV–6572 CJS(F).

United States District Court, W.D. New York.

Sept. 26, 2003.

Robert D. Hooks, Woods Oviatt Gilman, LLP, Rochester, NY, for Plaintiff and Counterdefendant Paul T. Freund Corp.

Paul D. Kelly, Davidson, Fink, Cook Kelly & Galbraith, LLP, Rochester, NY, for Defendant and Crossclaimant Commonwealth Packing Company.

Nina I. Webb–Lawton, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH, for Defendant and Counterclaimant Victoria's Secret Stores.

## DECISION and ORDER

SIRAGUSA, District Judge.

### INTRODUCTION

This diversity breach of contract case, removed from state court, is before the Court on plaintiff's motion (# 45) for partial summary judgment, defendants' motions (## 38, 39 & 40) for summary judgment and defendant's motion (# 64) to strike portions of plaintiff's affidavit. For the reasons that follow, the Court grants in part defendant's motion (# 64) to strike, grants defendant's motion (# 39) for summary judgment, grants defendant's motion (# 38) to dismiss the crossclaim, denies defendant's motion (# 40) for summary judgment, and grants, in part, plaintiff's motion (# 45) for partial summary judgment.

### BACKGROUND

A. *Procedural History and Claims*

Plaintiff Paul T. Freund Corp. ("Freund") filed a summons and complaint in New York State Supreme Court, Seventh Judicial District, on July 20, 2000. The verified complaint lists Commonwealth Packaging Company ("CPC") and Victoria's Secret Stores ("VSS") as defendants. It raises three causes of action. The first is against CPC for breach of contract. The second is against VSS for breach of contract, alleging that CPC was acting as an agent of VSS. The third cause of action is against VSS for tortious interference with contract "in the event Plaintiff was not in privity of contract with Victoria's Secret...." Complaint ¶ 28. Freund seeks compensatory damages

against each defendant for lost profits and the cost of manufacturing 66,806 or more boxes it did not deliver to VSS. Freund also seeks punitive damages against VSS in the third cause of action.

CPC's "Verified Answer with Counterclaim" [1] alleges, in a First counterclaim, that Freund breached the contract causing VSS to cancel the order and incur damages. In a second counterclaim, CPC seeks damages alleging that Freund breached express and implied warranties. In a third counterclaim, CPC alleges that Freund intentionally or negligently misrepresented that it was capable of fulfilling CPC's order in a timely basis and in conformance with the contract requirements. In its verified answer, CPC also makes a crossclaim against VSS for indemnification under contract or common law in the event that Freund obtains a judgment against CPC.

On November 21, 2000, VSS removed the action to this Court. VSS then filed, on December 6, 2000, a motion to dismiss, which the Court denied in a Decision and Order entered on September 19, 2001 (# 26). VSS filed an answer and counterclaim on October 17, 2001, in which it denied privity of contract with Freund and denied that CPC was its agent. In its counterclaim against Freund, CPC seeks damages against Freund for lost sales and other damages allegedly incurred as a result of Freund's breach of the contract. In its motion, CPC opposes damage claims brought by Freund.

**B.** *The Contract between Paul T. Freund Corp. and Commonwealth Packaging Company*

The following facts are taken from Freund's, CPC's and VSS's submissions and plaintiff's complaint. Except as otherwise indicated, these facts are not contested.

**1.** *Parties*

Freund is in the business of manufacturing paper boxes. Compl. ¶ 4. CPC is a distributor of paper and packaging goods. Waters dep. at 18 (attached to Webb–Lawton aff. (# 39) Ex. 1). VSS sells lingerie and women's clothing through retail stores throughout the United States. VSS planned to offer for sale in its stores a garment-filled gift box during the holiday [2] season ("project"). Tesner aff. ¶ 2. The box required several component parts, including a flocked paper, called Dainel, that was used to cover the box. Davis aff. ¶ 3. VSS contracted with CPC for the manufacture and fulfillment [3] of the boxes.

**2.** *The Decision to Choose Paul T. Freund Corp. to Manufacture the Boxes*

Because CPC is not itself a manufacturer, CPC talked to several manufacturers and solicited bids for the production of the box. Waters dep. at 76 (attached to Webb–Lawton aff. (# 39) Ex. 1). VSS contends that CPC's employee, Mindy Waters ("Waters") alone determined from which vendors she would seek bids to produce the boxes. Waters dep. at 456 (at-

---

**1.** The Court notes that CPC's Answer has never been docketed. An annotated copy of CPC's Answer is attached to Hooks aff. (# 47) Ex. B.

**2.** VSS listed the holiday season as the "holiday 1999 season" and Freund contends the season was to extend through Valentine's Day 2000.

**3.** Fulfillment refers to placing the merchandise inside the boxes. CPC subcontracted with Freund who subcontracted with Key Industries of Wayne County, New York, to place the clothing items inside the boxes.

tached to Webb–Lawton aff. (# 39) Ex. 1). Freund contends [4] that it was VSS who made the final decision to hire Freund. Pl.'s Statement ¶ 12. Both agree that one of the manufacturers that CPC approached was Freund. Waters dep. at 456 (attached to Webb–Lawton aff. (# 39) Ex. 1). On this issue, Waters testified that CPC suggested having the boxes made in China, but VSS rejected [5] that suggestion and informed CPC that, because of concerns about shipping overseas, they wanted the boxes made in the United States. Waters dep. at 66 (attached to Webb–Lawton aff. (# 39) Ex. 1). Waters solicited bids from United States box manufacturers, including Freund. Waters eventually recommend to VSS that they use Freund. *Id.* at 66–67. This series of questions and answers illustrates what happened next:

> Q. So what happened after you suggested to Victoria's Secret that Freund make the '99 Bikini box?
>
> A. They took my advice. . . .
>
> Q. So was the decision to hire Freund to make the box made by Commonwealth or by Victoria's Secret? [6]
>
> A. The ultimate decision was Victoria's Secret.

Waters dep. at 67 (attached to Webb–Lawton aff. (# 39) Ex. 1).

### 3. *Negotiations Prior to Contracting*

As is common in the industry, prior to entering into a contract with Freund to produce the necessary boxes, CPC requested that Freund prepare a sample box. Waters dep. at 446 (attached to Webb–Lawton aff. (# 39) Ex. 1). As requested, Freund prepared a sample. *Id.* at 109. VSS states that the sample box was provided by CPC to VSS for approval as to the quality of the boxes that CPC proposed to provide under its contract with VSS. *Id.* at 109. Freund, however, disputes this representation and contends that most of its samples were sent directly to VSS by Freund and not via CPC. VSS did in fact approve the sample. *Id.* at 66–67.

Freund submitted its bid for the project to CPC on August 3, 1999. CPC's App. of Exhibits (# 44) Tab 5 (Freund's bid for project). According to its bid, Freund's shipment of boxes was to begin eight weeks after receipt of CPC's confirming order. *Id.* On August 9, 1999, after VSS had contracted with CPC, CPC sent by facsimile to Freund four handwritten purchase orders for the manufacture and fulfillment of the boxes. Farnham dep. at 24–25 (attached to Webb–Lawton aff. (# 39) Exs. 2,11 (CPC purchase orders) (Bates Nos. FR000105–06)). Several days later, Waters faxed to Freund typewritten versions of the same purchase orders. Webb–Lawton aff. (# 39) Ex. 13 (Bates

4. Freund implies that it disagrees with the assertion that Waters made decisions about from what companies to solicit bids; however, it appears to the Court that there is really no dispute. Pl.'s Resp. to Def.'s Proposed Statement of Undisputed Facts (# 54) ¶ 12.

5. Freund argues that in May 1999, when CPC received a confirming order for 250,000 boxes from VSS, the boxes were going to be made in China. Hooks aff. (# 53) ¶ 26. To support this argument, Freund refers to VSS's fax of purchase orders dated May 25, 1999,

Hooks aff. (# 53) Ex. N, and Waters' fax to Ecological Fibers dated May 26, 1999, Hooks aff. (# 53) Ex. O, indicating that the pink paper for the project would be going to China. Freund argues that this is evidence VSS made the decision to have the boxes fabricated in the United States after it had hired CPC and, therefore, is evidence that VSS controlled CPC in this respect.

6. Counsel for VSS, objected to the question, but did not state the basis for her objection.

Nos. FR000118–19). The purchase orders, the Court notes, did not have a delivery schedule on them. *Id.*

Freund, by Acknowledgments dated August 17, 1999, accepted the August 9, 1999 Purchase Orders issued by CPC. CPC's App. of Exhibits (# 44) Tab 7 (Freund's Acknowledgment of Purchase Orders); Webb–Lawton aff. (# 39) Ex. 12. In its acceptance, Freund placed the following language: "This order is accepted subject to delays beyond our control and cannot be cancelled as goods are made specially for you." Paul T. Freund, Jr. ("Freund, Jr.") dep. Ex. 8 (attached to Hooks aff (# 53) Ex. A). Freund's acceptance did not contain a time schedule for delivery of the completed boxes. CPC's App. of Exhibits (# 44) Tab 7 (Freund's acknowledgment of purchase orders); Webb–Lawton aff. (# 39) Ex. 12. In a letter to VSS, Waters wrote that, "[t]he mill is doing a test run this week to determine how many boxes they can produce a day. Once we can finalize this number (by the end of the week), we can then determine [i]f the schedule you outlined to me is feasible." Mindy Waters letter to Stephanie Tesner (Aug. 15, 1999) at 1 (attached to Hooks aff (# 53) Ex. A (Freund, Jr.dep.Ex. 222) (Bates No. VSS00433–34)).

On August 13, 1999, VSS submits that Waters sent to Tom Farnham ("Farnham"), Freund's Vice President, a list of dates by which various quantities of the boxes would have to be delivered to VSS's distribution center. Waters Dep. at 46 (attached to Hooks aff. (# 53) Ex. B); Mindy Waters letter to Tom Farnham (Aug. 13, 1999) (attached to Webb–Lawton aff. (# 39) Ex. 10 (Ex. 6) (Bates No. FR000113)). Freund received this list of dates on or about the time that it was sent, Freund, Jr. dep. at 59–60 (attached to Webb–Lawton aff. (# 39) Ex. 3), and admits that it received the list of dates from CPC prior to executing and sending its acknowledgment forms to CPC. Farnham dep. at 45–46 (attached to Webb–Lawton aff. (# 39) Ex. 2). Freund disputes only that the dates were deadlines, and contends they were tentative dates VSS was "shooting for." Freund, Jr. aff. (# 52) ¶ 166.

C. *Cutting and Slitting of the Dainel*

The boxes for the project were to be covered in a flocked pink paper called Dainel, which was being manufactured in France. Davis aff. ¶ 3 (attached to Webb–Lawton aff. (# 39)). CPC determined that it would purchase the Dainel from Ecological Fibers ("Ecological"), a Massachusetts paper firm. Waters dep. at 459. VSS played no role in selecting the supplier of the paper. Waters dep. at 459 (attached to Webb–Lawton aff. (# 39) Ex. 1). Freund was aware of the fact that Ecological would be providing the Dainel for the project prior to acknowledging and accepting CPC's purchase orders. Farnham dep. at 11–12 (attached to Webb–Lawton aff. (# 39) Ex. 2). The Dainel came on large rolls, and in order to use it to cover the boxes Freund was making, it first had to be cut to the appropriate size (sheeting and slitting). Waters dep. at 197, 221 (attached to Webb–Lawton aff. (# 39) Ex. 1). The appropriate sizes for the cutting depended upon the dimensions of the final box and the process by which the box was being manufactured.

CPC selected Ecological to sheet and slit the paper. Waters dep. at 198 (attached to Webb–Lawton aff. (# 39) Ex. 1). CPC also paid for the sheeting and slitting of the paper. *Id.* At the time that CPC quoted the project to VSS, Waters was not aware that the Dainel would need to be cut to size, at an additional cost. Thus, in determining the price to quote to VSS for the boxes, she did not factor in this extra

expense. CPC, therefore, had to absorb the additional cost of the sheeting and slitting itself. *Id.* at 195, 219.

After CPC had quoted the contract to VSS, Waters learned that she would need to order additional Dainel in order to produce the number of boxes required by the VSS purchase orders. CPC had to absorb the cost for this additional paper as well. Waters Dep. at 225 (attached to Webb–Lawton aff. (# 39) Ex. 1). Prior to acknowledging the CPC purchase orders, Freund was aware that as the box manufacturer, it would be responsible for supplying the sheeting and slitting instructions to Ecological. Farnham dep. at 63–64, 65–68 (attached to Webb–Lawton aff. (# 39) Ex. 2). Freund planned to request that the bulk of the Dainel to be cut and shipped in four releases. LaFarier dep. at 251–52 (attached to Webb–Lawton aff. (# 39) Ex. 5); Stephen Quill letter to Tom Farnham (Nov. 22, 1999) (attached to Webb–Lawton aff. (# 39) Ex. 14 (Ex. 306) (Bates No. EF 00473)). Freund authorized the cutting of a small portion of the paper for an approximately 9,000–box test run in August 1999. Debbie Laughridge letter to Mindy Waters (Jan. 7, 2000) (attached to Webb–Lawton aff. (# 39) Ex. 16 (Ex. 257) (Bates Nos. EF 00483–84)).

Between September 30 and October 29, 1999, Ecological shipped the first three of the four releases of paper to Freund. LaFarier dep. at 251–52 (attached to Webb–Lawton aff. (# 39) Ex. 5); Stephen Quill letter to Tom Farnham (Nov. 22, 1999) (attached to Webb–Lawton aff. (# 39) Ex. 14 (Ex. 306) (Bates No. EF 00473)). VSS submits that despite the acknowledged time sensitivity of the project, Freund waited almost a month after receiving the third release from Ecological before it authorized Ecological to sheet, slit and deliver the final release of 30,000 yards of paper. LaFarier dep. at 252 (attached to Webb–Lawton aff. (# 39) Ex. 5); Debbie Laughridge letter to Mindy Waters (Jan. 7, 2000) (attached to Webb–Lawton aff. (# 39) Ex. 16 (Ex. 257) (Bates Nos. EF 00483–84)); Mindy Waters letter to Chet Baron (Nov. 19, 1999) (attached to Webb–Lawton aff. (# 39) Ex. 17 (Ex. 58) (Bates Nos. FR000224–25)). Freund responds that the project became time sensitive only after VSS issued a drop dead date in late November 1999, and after Ecological had failed to cut the Dainel correctly. Freund also denies the implication that its decision to wait was wrong. Freund, Jr. aff. (# 52) ¶ 181.

Freund claims in this lawsuit that the cut Dainel supplied by Ecological was "defective" and/or improperly cut. For example, Freund has alleged that the sheets varied in size and were not within acceptable "tolerances" for size. VSS argues that despite the alleged problems with the Dainel, neither Freund nor its subcontractors ever returned it to Ecological or rejected any shipments. LaFarier dep. at 187–88, 195–96 (attached to Webb–Lawton aff. (# 39) Ex. 5). Freund responds that it had no authority to reject the Dainel. Instead, Freund contends that it was told by CPC to do the best that it could. Further, Freund states that it and its subcontractors called Ecological to complain, and met with a representative of Ecological on September 16, 1999, to address its concerns.

In connection with the project, Freund subcontracted with Gold Pride to emboss a "V" and the "Victoria's Secret" name on parts of the boxes. Gerrie dep. at 23–24,[7] 26 (attached to App. of Exhibits (# 44) Tab 13). Gold Pride has stated that the sheets of paper it received from Ecological were not within acceptable tolerances for size and were not stacked neatly on the pallets.

---

7. Page 25 is missing from the copy in the Appendix of Exhibits.

*Id.* at 39, 41. However, Gold Pride took steps to address and work around these alleged problems with the paper. *Id.* at 41–42. Freund adds that these extra steps "took forever" and that it was surcharged by Gold Pride because of the extra handling required for the improperly cut Dainel.

The specifications for converting the Dainel were prepared by Freund. The parties dispute VSS's assertion that Freund did not direct Ecological to cut the paper for the first of the four releases until approximately September 30, 1999, weeks after CPC issued its purchase orders to Freund. LaFarier dep. at 139 (attached to Webb–Lawton aff. (# 39) Ex. 5); Joyce Hardell memorandum to Amand Godfron, Donna LaFarier & Kevin Sideleau (Sep. 30, 1999) (attached to Webb–Lawton aff. (# 39) Ex. 15). Freund contends that it issued cutting instructions on or about July 29, 1999, and August 16, 1999. Freund, Jr. aff. (# 52) ¶¶ 53 & 55. Freund further states these cutting instructions were sufficient to cut enough material to make 9,000 boxes, which would have permitted Freund to meet the first delivery, tentatively scheduled for September 15, 1999.

CPC also claims that the written converting specifications Ecological received on September 29, 1999, were sufficient to convert only one-fourth of the remaining stock of Dainel purchased for this order. App. of Exhibits (# 44) Tab 21 (written converting specifications Freund sent to Ecological for project). Freund responds that the cutting instructions received on September 29, 1999, were sufficient to cut all of the remaining Dainel. Freund, Jr. aff. (# 52) ¶ 93; Joyce Hardell memorandum to Armand Godfron, Donna LaFarier & Kevin Sideleau (Sep. 30, 1999) (attached to Hooks aff. (# 53) Ex. A (Ex. 289) (Bates No. EF 00230) & attached to Webb–Lawton aff. (# 39) Ex. 15 (Ex. 289) (Bates No. EF 00230)). Freund asserts that Ecological did not complete the first, second, or third release [8] until October 29, 1999. Stephen Quill letter to Tom Farnham (Nov. 22, 1999) (attached to Webb–Lawton aff. (# 39) Ex. 14 (Ex. 306) (Bates No. EF 00473)); Joyce Hardell memorandum to Armand Godfron, Donna LaFarier & Kevin Sideleau (Sep. 30, 1999) (attached to Hooks aff. (# 53) Ex. A (Ex. 289) (Bates No. EF 00230) & attached to Webb–Lawton aff. (# 39) Ex. 15 (Ex. 289) (Bates No. EF 00230)); Debbie Laughridge letter to Mindy Waters (Jan. 7, 2000) (attached to Webb–Lawton aff. (# 39) Ex. 16 (Ex. 257) (Bates Nos. EF 00483–84)).

CPC further alleges that Freund never claimed that the converted Dainel was not timely shipped after Freund provided written converting specifications to Ecological. App. of Exhibits (# 44) Tab 20 (purchase orders Freund sent to Ecological containing converting specifications for Dainel on other 1999 Victoria's Secret projects) at 187–88, 195–96. Freund disputes CPC's allegation, and asserts, instead, that it continued to claim that there were problems with the materials. Coughlin dep. at 50–52, 64–76 (attached to Hooks aff. (# 53) Ex. E); Kalish dep. at 146–48 (attached to Hooks aff. (# 53) Ex. D). Freund agrees that it never rejected, or returned, as nonconforming, any of the Dainel converted by Ecological and delivered to Freund or its vendors, App. of Exhibits (# 44) Tab 20 (purchase orders Freund sent to Ecological containing converting specifications for Dainel on other 1999 Victoria's Secret projects) at 187–88, 195–96, but contends that it did not have a right to reject the materials and was told to move ahead by CPC's

---

**8.** This term is not explained, but evidently refers to the batch of cut material that Ecological Fibers was to have released after executing Freund's cutting instructions.

Waters. In addition, Freund asserts that its subcontractors called, wrote to, and met with Ecological to address problems with Ecological's cutting and delivery of the Dainel. *See* Coughlin dep. at 64 (attached to Hooks aff. (# 53) Ex. E).

CPC also states that while each of Freund's vendors had difficulty processing the Dainel, such problems were inherent in this material, since Dainel is a flock (velour) that does not jog or stack easily. As a result, according to CPC, Freund's pre-production vendors had to jog and stack the Dainel manually, which allowed for the successful completion of pre-production work. Gerrie dep. at 67–68 (attached to App. of Exhibits (# 44) Tab 13). Freund counters that although there was testimony that due to the inherent nature of the material, it did not stack easily, representatives from Gold Pride and Parry Machine, both subcontractors to Freund, testified that the Dainel received by them (1) was dog-eared after it was stacked; (2) was cut to the wrong sizes; (3) was spliced together; (4) was wrinkled; (5) was damaged; (6) was too loosely rewound; and (7) was not rewound to thirty-six inches in core diameter. Freund contends that these issues had nothing to do with the inherent nature of the material and that Ecological testified that any inherent problems with the way the material was jogged or stacked was corrected at Ecological before it left its factory. Gerrie dep. at 62 (attached to App. of Exhibits (# 44) Tab 13) (on other jobs using a flocked material, they encountered no problems with the automatic jogging of the cut sheets).

### D. *Pre-production Procedure*

After the Dainel was converted, Freund planned for it to be sent to its vendors for pre-production. That pre-production consisted of "flatwrap" by Riverside, "stamping and embossing" by Gold Pride, and "lining the deck and tray" by Parry. App. of Exhibits (# 44) Tab 16 (Aug. 17, 1999 factory order for project). Once pre-production was completed, Freund's vendors delivered the box parts to Freund, so that Freund could assemble the boxes. Tobacco dep. at 78–83 (attached to App. of Exhibits (# 44) Tab 11). According to Freund's plant manager, Gary Tobacco, after all of the raw materials necessary to produce a total of 225,208 VSS holiday boxes had gone through pre-production and were returned to Freund, box assembly would take five to six weeks. Tobacco dep. at 78–83 (attached to App. of Exhibits (# 44) Tab 11). After assembly was complete, most of the 225,208 VSS holiday boxes were to be shipped to Key Industries ("Key"). Key was hired by Freund to fill the 1999 VSS holiday boxes with bikinis. App. of Exhibits (# 44) Tabs 6 (Commonwealth-issued purchase orders for 1999 holiday box), 7 (Freund's acknowledgment of purchase orders); Cavanaugh dep. at 15–16, 31–32, 50–52, 96, 98, 105 & 116–19 (attached to App. of Exhibits (# 44) Tab 14).

### E. *Scheduling Problems*

VSS contends that its initial list of due dates provided that the vast majority of the boxes were to be received by VSS at its warehouse by mid-November 1999. Mindy Waters letter to Tom Farnham (Aug. 13, 1999) (attached to Webb–Lawton aff. (# 39) Ex. 10). Freund disputes that the August 13, 1999 list contained "due dates," and submits that it was only a tentative schedule—one that VSS was "shooting for." *Id.*

On or about November 18, 1999 CPC provided Freund with a final extended deadline of December 3, 1999 for shipment of the VSS holiday boxes. VSS also agreed to accept up to 20,000 boxes between December 3, 1999 and December 9,

1999 at a thirty percent discount. Deborah Tucker e-mail to Mindy Waters (Nov. 24, 1999 6:58 PM) at 1 (attached to App. of Exhibits (# 44) Tab 23, Ex. 63 (Bates No. FR000236)).

### F. *Fulfillment*

After CPC and Freund had entered into their contract, Freund contends that a VSS employee traveled to Rochester on or about September 6, 1999, to visit Key Industries, Freund's "fulfillment house," to instruct workers as to the proper method of packaging the garments in the boxes. Freund aff. (# 52) ¶ 139 (second sentence only). VSS concedes that Stephanie Embry visited Rochester on one occasion in early September 1999 to meet with the fulfillment subcontractor and discuss with them how the garments should be placed in the boxes. Tesner aff. ¶ 14 (attached to VSS's Notice of Motion (# 39)).

However, as to fulfillment, Freund alleges that the garments to be placed in the boxes were shipped in an unsatisfactory manner to Key, and that this caused delays in the completion of the project. VSS disputes this contention and responds by stating that any issues with the manner in which the garments were shipped did not detrimentally affect Key's ability to meet deadlines or ship the necessary products. Cavanaugh dep. at 120 (attached to Hooks aff (# 53) Ex. H). VSS also states that Key's ability to perform was limited by a lack of boxes. *Id.* at 50 (attached to App. of Exhibits (# 44) Tab 14). According to Tom Cavanaugh, former Operations Manager at Key Industries, there was never a time when the fulfillment contractor was waiting for garments to fill empty boxes. *Id.* at 77 (attached to Hooks aff (# 53) Ex. H).

### G. *Cancellation of the Box Order*

VSS states that it cancelled a portion of its order with CPC because it had not received the necessary boxes by its deadlines. Freund contends that VSS cancelled the order because Ecological was unable to properly cut and slit the Dainel. VSS further states that CPC eventually cancelled a portion of its order from Freund. Of the more than 200,000 boxes that CPC ordered from Freund in connection with the four purchase orders, CPC cancelled as to 76,661 boxes, Compl. ¶ 16, although all 1999 holiday boxes delivered to VSS were accepted by VSS. Kelly aff. (# 51) ¶ 12. Freund denies, however, CPC's contention that it failed to ship 66,806 boxes to VSS, as required by the Purchase Orders it acknowledged on August 17, 1999. Mindy Waters letter to Chet Baron (Jan. 14, 2000) (attached to App. of Exhibits (# 44) Tab 25 (Ex. 79) (Bates Nos. FR000281–284)); Mindy Waters letter to Tom Farnham and Chet Baron (Jan. 20, 2000) (attached to App. of Exhibits (# 44) Tab 25 (Bates No. FR000287–88)); Unidentified document beginning with, "MATERIAL BASED ON THE FOLLOWING QUANTITIES" (attached to App. of Exhibits (# 44) Tab 26 (Bates No. 417)). Rather, Freund responds that it was precluded from completing the contracts by CPC, who cancelled the order before FREUND could finish production. Compl. ¶ 16. Freund further maintains that CPC cancelled only because its principal, VSS, cancelled. Deborah Tucker e-mail to Mindy Waters (Nov. 24, 1999 6:58 PM) (attached to Hooks aff (# 53) Ex. A (Ex. 63, Bates No. FR00236)).

### H. *Dispute Concerning Extension of Project to Valentine's Day 2000*

CPC claims that as of September 29, 1999, when Freund delivered converting instructions to Ecological for the first one-fourth of the Dainel purchased by CPC for

this order, it was impossible for Freund to timely complete production of all 225,208 boxes by the agreed-upon dates, and in time for the Christmas holiday, given the time it took to manufacture the boxes. Freund responds that this was not a Christmas box, *per se*. Freund contends it was also supposed to be for Valentine's Day 2000, and that if VSS did not cancel this order when it did, it would have been ready for Valentine's Day 2000. Freund, Jr. aff. (# 52). ¶¶ 21–22, 24 & Ex. G.

## SUMMARY JUDGMENT STANDARD

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley*, 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if the fact has some effect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir.2001), *rev'd on other grounds, Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir.1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir.1986). Rather, evidentiary proof in admissible form is required. FED. R. CIV. P. 56(e). Further-

more, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir.1996).

## DISCUSSION

### A. *Victoria's Secret Stores' Motion to Strike Portions of Paul T. Freund, Jr.'s Affidavit*

■ VSS has moved to strike several paragraphs from the affidavit of Paul T. Freund, Jr. Accompanying the motion is a paragraph by paragraph analysis of Freund Jr.'s affidavit and VSS's individual objections, if any, to each paragraph. In essence, VSS contends that the objectionable portions contain information not personally known to the affiant, conclusory allegations, hearsay, opinions and legal arguments.

■ The Federal Rules of Civil procedure admonish that,

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

FED. R. CIV. P. 56(e). "Although the rule's directive with respect to admissibility of an affidavit's contents on summary judgment has been liberally construed, its requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented." *Londrigan v. Federal Bureau of Investigation*, 670 F.2d 1164, 1174 (D.C.Cir. 1981). The case law also supports VSS's argument that conclusory allegations, *see Turiano v. Schnarrs*, 904 F.Supp. 400, 407 (M.D.Penn.1995), examination of thoughts, *id.*, opinions, *see Maldonado v. Ramirez*,

757 F.2d 48, 51 (3rd Cir.1985), argument, *see Jewell–Rung Agency, Inc. v. Haddad Organization, Ltd.*, 814 F.Supp. 337, 339 (S.D.N.Y.1993), and legal conclusions, *Sanders v. Douglas*, 565 F.Supp. 78, 80 (C.D.Cal.1983), are all prohibited from affidavits submitted in support of, or in opposition to, a motion under Federal Rule of Civil Procedure 56.

Freund responds to the motion to strike by asserting: (1) there is no basis to challenge the authenticity of any document attached to Freund Jr.'s affidavit; (2) there is no basis to challenge the admissibility of any deposition testimony cited in Freund Jr.'s affidavit; and (3) there is no basis for challenging excerpts from Kimberly Davis' affidavit. Freund relies on that portion of Federal Rule of Civil Procedure 56 that states, "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Fed. R.Civ.P. 56(e). He argues that, "Mr. Freund does not pretend that everything in his affidavit is based on knowledge that he had at the time of the events described therein." Hooks aff (# 70) ¶ 14. Finally, Freund points out that his affidavit "serves as a roadmap by which this Court may follow the true facts." *Id.* ¶ 17.

Freund makes no convincing argument concerning the admissibility of the portions of the affidavit opposed by VSS. To the extent that the affidavit can serve the Court as a road map, the Court will use it in that manner. Otherwise, those portions which contain information not based on Freund, Jr.'s personal knowledge, and those portions containing conclusory allegations, hearsay, opinions and legal arguments, will be disregarded by the Court in deciding the motions before it. When

Freund relies in its arguments on an objectionable portion of the Freund, Jr. affidavit, the Court will review the portion cited and determine whether it is admissible for the purposes of the motions, or merely points to other evidentiary proof in admissible form. Therefore, VSS's motion to strike is granted and, under the terms spelled out above, the following paragraphs of the affidavit are stricken: 5, 6, 12, 18, 19, 20, 23, 25, 27, 28, 29, 30, 31, 32, 33, 35, 37, 38, 39, 40, 42, 44, 45, 51, 54, 59, 62, 63, 64, 65, 66, 68, 71, 72, 73, 74, 75, 76, 77, 78, 79, 84, 86, 89, 90, 91, 92, 96, 100, 101, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 123, 124, 126, 127, 132, 137, 138, 139 [9], 140, 143, 144, 146, 147, 148, 149, 150, 151, 152, 154, 157, 165, 167, 170, 171, 172, 173, 174, 175, 182, 183, 184, 187, 188, 192, 195, 197, 198, 200, 201, 203, 204, 206, 210, 213, 214, 215, 216, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230 and 231.

### B. *Paul T. Freund Corp.'s Motion for Partial Summary Judgment Against Commonwealth Packaging Corporation*

Freund seeks partial summary judgment for certain defenses [10] and counterclaims raised by CPC. Specifically, Freund argues that: CPC's claim for future lost business profits must be dismissed as a matter of law; CPC's second counterclaim for breach of an implied or express warranty of fitness is misplaced and redundant; and CPC's third counterclaim for intentional or negligent misrepresentations must also be dismissed. For the reasons stated below, Freund's application is granted in part and denied in part.

### 1. *Lost Profits Claims*

■ The New York Court of Appeals discussed the issue of lost profits as damages when it held that:

A party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty. The rule that damages must be within the contemplation of the parties is a rule of foreseeability. The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made. The breaching party need not have foreseen the breach itself, however, or the particular way the loss came about. It is only necessary that loss from a breach is foreseeable and probable (*see*, Restatement [Second] of Contracts § 351; 3 Farnsworth, Contracts § 12.14 [2d ed 1990]).

*Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993). Certainly the parties to this transaction, CPC and Freund, could have foreseen the probable loss of profits to CPC for the project. Freund argues, unpersuasively, that Waters did not foresee the possibility of anything going wrong with the contract. But her naive optimism does not prove that damages from lost profits were not foreseeable. Thus, to the extent that CPC's first counterclaim seeks damages for lost profits pertaining to the project, Freund's motion is denied.[11]

---

**9.** The second sentence of ¶ 139 is not stricken.

**10.** CPC acknowledged in its answering affirmation that "the first, second and third Affirmative Defenses all address the same essential facts...." Kelly aff. (# 51) ¶ 11. CPC consents "to merge all three Affirmative Defenses into a single Affirmative Defense, that Plaintiff breached this Contract...." Kelly aff. (# 51) ¶ 14.

**11.** Freund's memorandum of law, in Point I, can be read to argue that CPC's counterclaim for lost profits from the project ought to be dismissed as a matter of law.

■ Regarding CPC's speculative claims of lost profits from *future* jobs VSS *may* have given to CPC had CPC successfully delivered on the project, Freund has shown that those lost profits are not capable of measurement within a reasonable degree of certainty. CPC's claim of $500,000 lost profits from potential future jobs from VSS is merely speculative and unsupported .by the evidentiary proof. CPC acknowledged in its responsive affirmation that Waters' letter to Freund detailing the potential consequences to CPS's future business dealings with VSS should the project not go smoothly came about *after* the contract with Freund was already in place.[12] Therefore, Freund's motion to dismiss that claim from CPC's First Counterclaim is granted.

### 2. *Breach of an Implied or Express Warranty of Fitness*

■ In order to prove a breach of an implied or express warranty of fitness, CPC must show that the boxes did not meet the physical characteristics expressly stated or implicitly needed to make the products merchantable in the industry. *See* UCC § 2–314(2). "Under paragraph (c) of [UCC § 2–317] ... the implied warranty of merchantability is displaced by the express warranty that the goods will comply with the specifications. Thus, where the buyer gives detailed specifications as to the goods, neither of the implied warranties as to quality will normally apply to the transaction unless consistent with the specifications." Comment 9 to UCC § 2–316. In any event, CPC's answering affirmation does not dispute that the boxes delivered by Freund were ac-

ceptable to VSS. *See* Kelly aff. (# 51) ¶ 12. The timeliness of delivery is not part of the express or implied warranty of fitness. CPC's Second Counterclaim is, therefore, dismissed.

### 3. *Intentional or Negligent Misrepresentations*

■ CPC alleges in its third counterclaim against Freund that at all relevant times, Freund intentionally or negligently misrepresented that it was capable of fulfilling CPC's box order on a timely basis and in conformance with the contract requirements. CPC Answer ¶ 41. New York law is well settled in this area: "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark–Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) (citations omitted). Further, the "legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Id.* Nothing in CPC's claim is more than a restatement of implied contractual obligations.

Waters, evidently CPC's key employee on this contract, testified at her deposition with regard to the time table VSS had sent to her for delivery of the boxes. Waters had contacted Freund who had told her they were going to do a test run and after the test run would be able to determine whether they could meet the VSS timetable. The following questions and Waters' answers pertain to the issue here, specifically, Freund's representations at the time

---

12. CPC argues that Water's letter suggests the ongoing nature of the conversations between Waters and Freunds' Vice President on the importance of the project to CPC's future dealings with VSS. CPC Interrogatory No. 15 (attached to Hooks aff. (# 47) Ex. D), reveals

that Deposition Exhibits 35, 53 and 61 support CPC's claim. Those Deposition Exhibits, however, are not among those submitted by Freund. *See* Hooks aff. (# 53) Ex. A. CPC's Appendix of Exhibits (# 44) does not appear to contain the referenced deposition exhibits.

372

it entered into the contract as to when they would be able to deliver the boxes:

Q. Is it fair to say that as of August 15th, you were advising Victoria's Secret that the schedule they had sent you was dependent upon the outcome of the test run?

A. Right.

Q. And when you used the word "schedule" in your letter of August 15th, were you referring to the schedule that's set forth on Defendant's Exhibit 6?

A. Yes.

Q. So is it fair to say that as of August 15th, 1999, Paul T. Freund Corporation had not committed to this particular schedule?

A. Correct.

Waters dep. at 261 (attached to Webb–Lawton aff. (# 39) Ex. 1). The Exhibit 6 referred to above was an August 13, 1999, letter sent by facsimile from Mindy Waters to Tom Farnham of Freund setting forth dates by which VSS wanted the completed boxes delivered to them in Ohio. It set forth the number of boxes needed for the Victoria's Secret Catalog (not a party to this lawsuit) and for VSS, with the dates the required numbers of boxes were to be in Ohio. Hooks aff. (# 53) Ex. A (Ex. 6) (Bates No. FR00113). Waters wrote, "I need you to review this schedule that VSS Stores [sic] and Catalog gave me. We need to discuss so that I can respond immediately!" *Id.* Freund has met its burden of showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry CPC's burden of proof at trial on this counterclaim and is, therefore, entitled to its dismissal. Thus, Freund's motion to dismiss that portion of the Third Counterclaim, that at all relevant times Freund intentionally or negligently misrepresented

that it was capable of fulfilling CPC's box order on a timely basis and in conformance with the contract requirements, is granted.

4. *Agency*

▮▮▮ Freund argues that under the circumstances of this case, the issue of whether CPC was VSS's agent is a question of fact for the jury. The Court disagrees. Determining the existence of agency is a mixed question of law and fact. *Cabrera v. Jakabovitz,* 24 F.3d 372, 385 (2d Cir.1994). As the Second Circuit has observed,

A determination that an agency relationship exists requires the application of a legal standard to a set of historical facts.... Unless the facts are insufficient to support a finding of agency *or* there is no [sic] dispute as to the historical facts, the question of agency should be submitted to the jury....

*Cabrera,* 24 F.3d at 386 (emphasis added). Another treatise, quoted by the Second Circuit, explained the issue this way:

Agency is a question of fact to be determined by the jury or other trier of facts unless no competent evidence legally sufficient to prove it has been introduced or the material facts from which it is to be inferred are undisputed and only one conclusion can be reasonably drawn therefrom.... On the other hand, agency is a question of law for the court where the material facts from which it is to be inferred are not in dispute, the question of agency is not open to doubt, and only one reasonable conclusion can be drawn from the facts in the case.

*Cabrera,* 24 F.3d at 386 (quoting 3 C.J.S. Agency § 547 (1973) (footnotes omitted)). New York courts have held that "when ... the facts are not disputed, the question of agency should be resolved by the court." *Plymouth Rock Fuel Corp. v. Leucadia,*

*Inc.*, 100 A.D.2d 842, 842, 474 N.Y.S.2d 79 (2d Dept.1984) (citation omitted).

 The elements of common law agency are: (1) consent; (2) fiduciary duty; (3) absence of gain or risk to the agent; and (4) control by the principal. H.G. Reuschlein and W.A. Gregory, *Agency and Partnership* 11 (1979). The element most essential to the demonstration of any agency relationship is that of control. *Id.; Boss v. International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers*, 567 F.Supp. 845, 847 n. 1 (N.D.N.Y.1983) (citations omitted). To establish the existence of an express or implied agency, Freund must show the following required factual elements: "[1] the manifestation by the principal that the agent shall act for him, [2] the agent's acceptance of the undertaking and [3] the understanding of the parties that the principal is to be in control of the undertaking." Restatement (Second) of Agency § 1 cmt. b (1958) (*quoted in Cabrera*, 24 F.3d at 386); *see also Flame Cut Steel Products Co., Inc. v. Performance Foams & Coatings, Inc.*, 46 F.Supp.2d 222, 228 (E.D.N.Y.1999) (agency can be express, implied or apparent). "Authority that is express or implied arises from a manifestation of consent from principal to agent. Such consent can be either express or implied from the parties' words and conduct as construed in light of the surrounding circumstances.'" *Flame Cut Steel Prods. Co.*, 46 F.Supp.2d at 228 (citations and internal quotes omitted).

 Agency can also be based on a theory of apparent authority. Apparent authority can exist where "words or conduct *of the principal*, communicated to a third party, . . . give rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Flame Cut Steel Products*, 46 F.Supp.2d at

228 (internal quotation marks and citation omitted, emphasis added). As the Second Circuit wrote in a case where an employer's negligence in failing to examine credit card statements and discover that its employee had fraudulently obtained a credit card with charges running to the employer, created apparent authority in the employee's use of the cards:

> Apparent authority is "entirely distinct from authority, either express or implied," [Restatement (Second) of Agency] § 8 cmt. a [(1958)], and arises from the "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him," *id.* § 27; *see also Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989). Apparent authority, then, is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent. *See Fennell*, 865 F.2d at 502 (collecting cases).

The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment. *See, e.g., Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 994 (2d Cir.1991) (citing *Stanford v. Kuwait Airways Corp.*, 648 F.Supp. 1158, 1162 (S.D.N.Y. 1986)). However, a principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change in position on the part of the third party. *See* Restatement [(Second) of Agency] § 8B; *Masuda v. Kawasaki*

*Dockyard Co.*, 328 F.2d 662, 665 (2d Cir.1964).

*Minskoff v. American Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).

VSS has demonstrated its entitlement to summary judgment with regard to Freund's agency theory by showing the lack of a material question of fact and by demonstrating that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. In this regard, Freund cites no words or conduct on the part of VSS demonstrating that VSS caused CPC to believe it was acting as VSS's agent. Instead, Freund relies on certain acts by VSS to show that VSS exercised day-to-day control over CPC and argues, therefore, that CPC was VSS's agent. However, the evidence shows that VSS maintained control only over the finished product, not the means of production. The means of production was controlled independently by CPC.

▮▮▮ Further, no evidence has been produced to show an apparent agency relationship created by VSS in CPC. No evidentiary proof in admissible form has been presented to demonstrate that VSS intended CPC to act as its agent for the project rather than as an independent contractor. Although VSS made the decision not to use a foreign manufacturer because of a concern that the boxes might become damaged during overseas transport, Waters' testimony supports VSS's position that no agency relationship existed. Specifically, she testified it was she who decided: from whom to obtain bids; whom to recommend as manufacturer of the boxes; who would cut the Dainel material; and how much paper to order. It was CPC's job to deliver a final product to VSS in a form acceptable to VSS. Further, Freund has produced no evidence to show that

VSS maintained day to day control over CPC or that it relied detrimentally on words spoken or written by VSS. That Waters thought she was the "ears and thoughts" of VSS, does not establish that CPC was VSS's agent. *Id.* Freund has failed to show any act or conduct on VSS's part communicated to Freund that would give rise to a reasonable belief by Freund that CPC was the apparent agent of VSS. The only possible words on which Freund relied were "shooting for," written by CPC's Mindy Waters on August 10, 2003, in reference to the "time table we are shooting for...." Mindy Waters letter to Tom Farnham (Aug. 10, 1999), Attached as Ex. A to Hooks aff. (# 53), Deposition Ex. 220, Bates No. 00561. This is insufficient proof of CPC's apparent authority to act as VSS's agent.

In addition, CPC bore the risk of mistakes in estimates and had to purchase the extra material required for the boxes when manufacturing was changed from China to the United States. CPC likewise had to cover the cost of having the paper sheeted and slit and CPC was subject to penalties for delivering boxes late. These facts all demonstrate that CPC was a non-agent independent contractor for VSS. Therefore, VSS's motion for summary judgment on Count Two of Freund's complaint is granted.

### C. *Consolidated Packaging Company's Motion for Summary Judgment Against Paul T. Freund*

#### 1. *CPC's First Counterclaim for Breach of Contract and Lost Profits*

▮▮▮ CPC argues that Freund breached the contract with it by, *inter alia,* failing to meet dates certain for delivery of the boxes. As is clear from the Court's review of the evidentiary materials submit-

ted with the motions, a material factual dispute exists with regard to whether the agreement between CPC and Freund included a firm shipping schedule, and, indeed, whether the "holiday" referred to by the parties was Christmas 1999 only, or also included Valentine's Day 2000. These factual disputes go to the heart of the contract and, therefore, must be resolved prior to determination of whether Freund breached the contract. Thus, summary judgment is precluded. As stated above, to the extent that CPC's first counterclaim seeks damages for lost profits pertaining to the project, it may go forward. However, with respect to CPC's claims of lost future profits, also contained in its first counterclaim, as stated above, they are dismissed.

2. *CPC's Second Counterclaim for Breach of Express or Implied Warranty of Fitness for the Purpose for Which it Was Intended*

As indicated above, CPC's second counterclaim for breach of an express or implied warranty is dismissed in its entirety.

3. *CPC's Third Counterclaim for Negligent Misrepresentation*

The Court, above, granted Freund's motion to dismiss that portion of the third counterclaim alleging that Freund intentionally or negligently misrepresented that it was capable of fulfilling CPC's box order on a timely basis and in conformance with the contract requirements.

D. *Victoria's Secret Stores Motion to Dismiss Commonwealth Packaging Company's Crossclaim Against it*

The Court addressed VSS's motion (# 38) during oral argument and granted it at that time from the bench. VSS met its burden of showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry

CPC's burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In responding to an interrogatory pertaining to its crossclaim against VSS, CPC admitted that it

plead[,] in its Verified Answer with Counterclaim[,] a Crossclaim against Victoria's Secret for contribution and indemnification in the event it was learned in discovery that there was culpable conduct on the part of Victoria's Secret. To date, no such culpable conduct on the part of Victoria's Secret has been discovered and CPC does not anticipate that it will present evidence in support of this Crossclaim during the trial of this matter.

CPC's Resp. to Pl.'s First Req. for Interrogs. at 21 (attached as Ex. B to VSS Notice of Mot. (# 38)). As stated during oral argument, VSS is clearly entitled to summary judgment on CPC's crossclaim; thus, its motion is granted.

**CONCLUSION**

For the reasons stated above, VSS's motion (# 64) to strike Paul T. Freund, Jr.'s affidavit (# 52) is granted in part, as outlined above. VSS's motion for summary judgment (# 39) is granted and Count Two of Freund's Complaint against VSS is dismissed. VSS's motion (# 38) to dismiss CPC's crossclaim against it is granted. CPC's motion (# 40) for summary judgment against Freund is denied. Freund's motion (# 45) for partial summary judgment against CPC is granted in part and the Second and Third counterclaims asserted by CPC, along with a portion of the First counterclaim seeking damages for future lost business, are dismissed.

IT IS SO ORDERED.