**DESIGN STRATEGIES, INC., Plaintiff,**

v.

**Marc E. DAVIS, Info Technologies, Inc., Info Technologies Web Solutions, Inc., and John Goullet, Defendants.**

No. 02CIV5329VM.

United States District Court,
S.D. New York.

April 28, 2005.

Leonard Benowich, Roosevelt, Benowich & Lewis, L.L.P., White Plains, NY, for Marc E. Davis.

Jason M. Butler, Sharon L. Nelles, Sullivan & Cromwell, New York, NY, Helen Bergman Moure, Preston, Gates & Ellis, L.L.P., Seattle, WA, for Microsoft Corp.

Patrick V. DiDomenico, Richard Scott Garley, Gibbons, Del Deo et al., New York, NY, for Info Technologies Web Solutions, Inc.

Jack S. Dweck, The Dweck Law Firm, LLP, New York, NY, for Design Strategy, Inc.

## DECISION AND ORDER

MARRERO, District Judge.

By Order dated February 16, 2005 (the "February 16th Order"), the Court denied a motion filed by defendants Marc E. Davis ("Davis"), Info Technologies, Inc., Info Technologies Web Solutions, and John Goullet (collectively the "IT Defendants," and together with Davis, "Defendants") to strike the demand by plaintiff Design Strategies, Inc. ("Design") for a jury trial in this case. On April 5, 2005, the Court held a telephone conference (the "April 5th Conference") concerning Defendants' motion for an order precluding Design from introducing at trial evidence of its alleged lost profits and the testimony of two proposed witnesses. At that conference, the Court ruled on the record that Defendants' motion was granted in part and denied in part. The Court sets forth below the specific findings, reasoning, and conclusions underlying both of these rulings.

## I. BACKGROUND

The Court addressed many of the facts and issues involved in this case in its Decision and Order granting in part and denying in part Defendants' and Plaintiff's cross-motions for summary judgment ("Design I").[1] Accordingly, those matters will not be reiterated here, except to explain the factual basis for the instant motions. As explained in Design I, the crux of Design's causes of action lies with Defendants' alleged diversion of a contract with Microsoft, Inc. ("Microsoft") for a project known as Contentville.com ("Contentville"). Contentville entailed establishing a major high-profile website for an electronic bookseller that would use Microsoft's software and compete directly with

---

1. The Court's Decision and Order setting forth the facts and claims involved in this case is reported as *Design Strategies, Inc. v. Davis,* No. 02 Civ. 5329(VM), 2004 WL 1394327 (S.D.N.Y. June 22, 2004).

well-known websites such as amazon.com and barnesandnoble.com.

Design alleges that sometime between October and December 1999, Davis actively solicited and procured the Contentville contract for the IT Defendants while still an employee of Design and without giving Design an opportunity to compete for the contract, thereby breaching his fiduciary duty to Design.

## II. DISCUSSION

### A. MOTION TO PRECLUDE EVIDENCE OF LOST PROFITS

Design has not provided sufficient discovery regarding the amount of or basis for calculating damages based on alleged lost profits to enable it to seek those damages at trial. Federal Rule of Civil Procedure 26(a)(1)(C) ("Rule 26(a)(1)(C)") requires that a party seeking damages provide the opposing party with a computation of the damages sought and "the documents or other evidentiary material ... on which such computation is based." This requirement is effective even if the opposing party does not specifically request this material. See Fed.R.Civ.P. 26(a)(1) ("Rule 26(a)(1)"). In this case, however, the IT Defendants specifically requested that Design "[s]tate in detail each financial expense or loss allegedly incurred by plaintiff as a result of any acts or omissions of IT Defendants in this

action giving: (a) a description of its nature; (b) the amount; (c) the date incurred; (d) the amount of similar estimated future expenses or losses, if any." (IT Defendants' First Set of Interrogatories and Request for the Production of Documents ("IT Defs.' Interrogs.") ¶ 9.)

Despite Rule 26(a)(1)'s disclosure requirement and the IT Defendants' request, Design has not provided Defendants or the Court with the required computation of lost profits. A review of the record before the Court indicates that Design's only allegation as to the amount of profits that it would have earned but for Davis's alleged disloyalty is its statement in the Complaint that it suffered "particular monetary damage, in an amount ... believed to be in excess of Twenty-five Million ($25,000,000.00) Dollars in lost revenues." (Compl.¶ 33.) Design has not, however, provided any specific computation of its alleged lost profits, nor any documents or other evidence on the basis of which such a computation could be made.

In addition, Design did not list lost profits or compensatory damages as remedies sought in its initial disclosures or in its response to the IT Defendants' interrogatories.[2] Thus, to the extent that Design gave Defendants notice of its intention to seek lost profits in its Complaint, it arguably took that notice away by omitting such damages from its subsequent repre-

---

**2.** In its Initial Disclosure Statement, Design describes the damages it seeks as follows:

1. All monies paid to Marc Davis for salaries based upon breach of fiduciary relationship with Plaintiff.
2. All monies earned by Marc Davis as a result of unlawful diversion of business from Design Strategy to the corporate Defendants.
3. All profits earned by the Defendants as a result of the unlawful diversion of business from the Plaintiff to the Defendants, which business was generated with Microsoft Corporation.

4. Attorneys' fees for the prosecution of this action.
5. Punitive damages.
6. Interest costs and disbursements.
(Initial Disclosure Statement of Plaintiff Design Strategies, Inc. dated October 22, 2002 at 3.)

Design repeats this description of the damages it seeks, and adds a claim for the "loss of sale of Design Strategy," in its response to the IT Defendants' interrogatories. (Plaintiff's Response to All Defendants', Except Davis', First Interrogatories dated March 26, 2003 ("Pl.'s Resp.") at 6.)

sentations regarding the remedies it planned to seek, and by failing to produce any discovery with respect to them.

■ Federal ·Rule of Civil Procedure 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as· evidence at a trial . . . any witness or information not so disclosed." "Rule 37(c)(1)'s preclusionary sanction is 'automatic' absent a determination of either 'substantial justification' or 'harmlessness.'" *American Stock Exchange, LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (citing *Salgado v. General Motors Corp.*, 150 F.3d 735, 742 (7th Cir.1998); *In re Motel 6 Sec. Litig.*, 161 F.Supp.2d 227, 243 (S.D.N.Y.2001); *Bastys v. Rothschild,* No. 97 Civ. 5154, 2000 WL 1810107, at *26 (S.D.N.Y. Nov.21, 2000)).[3]

■ Design has not provided any justification for its failure to disclose information regarding the amount of, or basis for com-

**3.** Courts in this Circuit have noted that, "[d]espite the 'self-executing' nature of Rule 37(c)(1), the imposition of sanctions under the rule is a matter within the trial court's discretion." *American Stock Exchange, LLC*, 215 F.R.D. at 93 (citing *Jockey Int'l, Inc. v. M/V "LEVERKUSEN EXPRESS"*, 217 F.Supp.2d 447, 452 (S.D.N.Y.2002)). In support of this proposition, they cite authority that ultimately relies on a Third Circuit case, *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153 (3d Cir. 1995), in which the court explains that Rule 37(c)(1) "expressly provides that sanctions should not be imposed if substantial justification exists for the failure to disclose, or if the failure to disclose was harmless. Thus, the rule does not leave· district courts without discretion." ·*Newman*, 60 F.3d at 156 (citation omitted). This statement, as well as the plain language of Rule 37(c)(1), indicate that, while trial courts have discretion to determine whether or not a substantial justification exists and whether or· not a failure to disclose is harmless, if the trial court finds that there is no substantial justification and the failure to disclose is not harmless, preclusion is mandatory.

Nevertheless, some courts in this Circuit abide by the principle that preclusion is to be imposed only "in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the ·Federal Rules of Civil Procedure." *Ward v. National Geographic Soc'y*, No. 99 Civ. 12385, 2002 WL 27777, at *2 (S.D.N.Y. Jan. 11, 2002) (citations omitted). This proposition ·appears to originate from cases that applied Rule 37 before it was amended in 1993 to make preclusion automatic in cases where the failure to disclose lacks a substantial justification and is not harmless. The court in *Ward*, for in-

stance, cites a series of cases, each of which ultimately relies on *Burks v. Eagan Real Estate Inc.*, 742 F.Supp. 49 (N.D.N.Y.1990). *Burks* was decided before subsection (c)(1) was added to Rule 37. The court in that case derived its authority to preclude evidence from subsection (b)(2). That subsection has not been altered since *Burks* was decided. It provides that, "if a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just." Fed.R.Civ.P. 37(b)(2). Thus, the *Burks* court applied a subsection of Rule 37 that clearly leaves decisions regarding preclusion of evidence to the court's discretion. For these reasons, the Court does not consider it necessary to make a finding of bad faith in order to find that preclusion is mandatory in this case. *Cf. Wantanabe Realty Corp. v. City of New York*, No. 01 Civ. 10137, 2004 WL 169751, at *2 n. 2 (S.D.N.Y. Jan.28, 2004) (citing *Hein v. Cuprum, S.A.*, 53 Fed.Appx. 134, 137 n. 1 (2d Cir.2002)) ("The Court assumes without deciding that bad faith or wilfulness is not a *sine qua non* of exclusion under Rule 37(c)(1).").

In any case, the Second Circuit has not addressed the question whether or not it is necessary to make a finding of "bad faith" or "callous disregard" in order to preclude evidence pursuant to Rule 37(c)(1). *See Hein v. Cuprum, S.A.*, 53 Fed.Appx. 134 (2d Cir.2002) ("Some trial courts in this Circuit have read a bad-faith requirement into Rule 37(c)(1). . . . We express no opinion as to whether a showing of bad faith is required before evidence may be excluded under Rule 37(c)(1)."). Therefore, no binding authority requires the Court to do so.

puting, its alleged lost profits. Instead, Design's counsel argued at the April 5th Conference that Design's disclosure of its financial statements constitutes sufficient discovery to enable it to proceed with its lost profits claim. (Tr. at 7.) Design's financial statements, however, do not provide any means by which to compute the profits that Design would have earned had it been awarded the Microsoft contract. While the financial statements may indicate Design's standard profit margin, they do not provide any basis on which to calculate the specific sum of money that the Contentville Project would have generated had it been awarded to Design, nor the percent of that sum that Design would have retained.

Even in the absence of a substantial justification for the failure to disclose, Rule 37(c)(1)'s automatic sanction does not apply unless the failure results in harm to the opposing party. "The burden to prove ... harmlessness rests with the dilatory party." *American Stock Exchange*, 215 F.R.D. at 93 (citation omitted). Design, however, has not provided any argument or reason to believe that permitting it to proceed with its lost profit claims, and conducting the additional discovery that would be necessary in order to allow it to do so, would be harmless.

This action was commenced in July 2002. Discovery was scheduled to close in October 2003, after the granting of several extensions. In addition, the trial date has already been postponed once, in part at Design's request. To reopen discovery for purposes of investigating the subject of lost profits would inevitably result in further substantial delays in the resolution of this case and impose additional costs on Defendants. Defendants would thus be harmed if the Court were to permit Design to pursue a lost profits theory of damages, in that Defendants would be required either to postpone a trial for which they are

otherwise prepared and which has already been significantly delayed, or proceed without having had the opportunity to conduct adequate discovery on this issue. Therefore, the Court finds that permitting Design to advance a lost profits theory of damages in this case would not be harmless. *See American Stock Exchange*, 215 F.R.D. at 95 (finding that, "[b]ecause the [plaintiff] did not know during discovery that its alleged infringement of patent claim 34 was now at issue, [the defendant's] failure to amend seasonably was not harmless. The [plaintiff] was prejudiced by [the defendant's] late disclosure of its claim regarding patent claim 34 because the plaintiff was ... deprived of the opportunity to pursue needed fact discovery unless it was willing to accept a substantial delay in the case."). Given that Design has not presented, and the Court has not found, a substantial justification for its failure to disclose the required discovery, preclusion of any evidence of lost profits is mandatory under Rule 37(c)(1).

In violating Rule 26(a)(1)(C), Design has also failed to provide the Court with any basis on which to determine whether or not its alleged lost profits are "capable of measurement based upon known reliable factors without undue speculation," *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007, 1010 (1993), as New York law requires. The absence of any basis on which to make this determination further supports the Court's holding that Design may not pursue a lost profits theory of damages at trial.

Although, as Design points out, "the burden of uncertainty as to the amount of damage is upon the wrongdoer" in cases where "the existence of damage is certain, and the only uncertainty is as to its amount," *Schonfeld v. Hilliard*, 218 F.3d 164, 174–175 (2d Cir.2000) (quoting *Contemporary Mission, Inc. v. Famous Music*

*Corp.,* 557 F.2d 918, 926 (2d Cir.1977) (quotation marks omitted)), this principle has no application here where there has not yet been a determination regarding liability. Moreover, the fact that the burden of uncertainty shifts to the wrongdoer upon a showing of liability does not alleviate the responsibility of the party seeking damages to provide adequate discovery concerning their amount and the basis of their computation. A party seeking damages may not withhold evidence concerning those damages in the hope that the party will prove liability and then be able to shift the burden of uncertainty to the opposing party. For these reasons, the Court ruled at the April 5th Conference that Design may not present evidence of its alleged lost profits at trial.

### B. *MOTION TO STRIKE JURY DEMAND*

As the Court stated on the record at the April 5th Conference, the Court's conclusion that Design may not present evidence of lost profits at trial significantly affects the Court's final determination regarding whether or not Design has a right to a jury trial in this case. (Tr. at 6.) At the time that the Court issued its February 16th Order ruling on the jury trial question, Defendants had not yet moved to preclude evidence of lost profits. As noted above, the February 16th Order ruled that Design had a right to a jury trial only to the extent that it asserted the remedy of compensatory damages in the form of lost profits. Now that the Court has ruled, based on Design's discovery failures, that Design may not proceed with any claims for lost profits, the only basis Design formerly had for a right to a jury trial has been removed. For this reason, the Court

concludes that Design does not have a right to a jury trial on the remaining claims in this case. Nevertheless, the Court will set forth below the reasoning, findings, and conclusions on which it based its February 16th Order.

The Seventh Amendment provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. The Supreme Court has interpreted the phrase "Suits at common law" to refer to "suits in which *legal* rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies [are] administered." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 564, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (emphasis and alteration in original) (quoting *Parsons v. Bedford,* 28 U.S. 433, 3 Pet. 433, 447, 7 L.Ed. 732 (1830) (internal quotation marks omitted)).

In order to determine whether an action is legal or equitable in the context of determining whether or not a party is entitled to a jury, the Court must "examine both the nature of the issues involved and the remedy sought. First, we compare the ... action to 18th-century actions brought in the courts of England prior to the merger of courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second inquiry is the more important." [4] *Id.* at 565, 110 S.Ct. 1339 (citing *Tull v. United States,* 481 U.S. 412, 417–418, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42, 109 S.Ct. 2782, 106

---

4. The parties do not dispute that federal law governs the issue of a right to a jury in this case. *See Pereira v. Cogan,* No. 00 Civ. 619, 2002 WL 989460, at *2 (S.D.N.Y. May 10, 2002) ("Whether a suit is legal or equitable is determined by federal law, even while the cause of action is created by state law.") (citing *Simler v. Conner,* 371 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963)).

L.Ed.2d 26 (1989)). *See also Germain v. Connecticut Nat. Bank,* 988 F.2d 1323, 1328 (2d Cir.1993) ("The standard test is to determine first whether the action would have been deemed legal or equitable in 18th century England, and second whether the remedy sought is legal or equitable in nature."). In conducting this inquiry, the Court must "resolve any doubts in favor of the right to a jury trial," *Lee Pharmaceuticals v. Mishler,* 526 F.2d 1115, 1117 (2d Cir.1975), and "scrutinize[ ] [the relevant issues] with the utmost care." [5] *Terry,* 494 U.S. at 565, 110 S.Ct. 1339 (quoting *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 501, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (internal quotation marks and further citation omitted)).

Design's remaining causes of action [6] are characterized in the Complaint as breach of fiduciary duties, aiding and abetting the breach of fiduciary duties, wrongful inducement to breach fiduciary duties (collectively, the "Breach of Fiduciary Duties Claims"), unfair competition, and unjust enrichment. Design's own characterization of its causes of action and the remedies it seeks, however, does not control the Seventh Amendment analysis. "The constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings." *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477–478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Moreover, the conventional label that attaches to a given cause of action or remedy may not by itself

tell us whether the claim is legal or equitable. "Issues are not inherently legal or equitable. They are like chameleons which take their color from surrounding circumstances." 9 C. Wright & A. Miller, *supra,* § 2302 (quoting Fleming James, *Right to a Jury Trial in Civil Actions,* 72 Yale L.J. 655, 692 (1963)) (internal quotation marks omitted). Thus, the determination of a claim's legal or equitable nature is highly contextual and is not governed by bright-line rules.

With these general considerations in mind, the Court will analyze the nature of Design's remaining causes of action and the remedies it seeks in turn. The Court concludes, for the reasons stated below, that Design's remaining claims (which no longer include a claim for lost profits) should be classified as equitable and, as a result, that Design is not entitled to a jury trial in this case. In addition, the Court will explain the basis for its prior ruling that Design's now dismissed claim for lost profits would have afforded it a right to a jury trial.

1. *Design's Remaining Causes of Action: Breach of Fiduciary Duty, Unfair Competition, and Unjust Enrichment*

"Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity'—carrying with them no right to trial by jury." *Pereira,*

---

**5.** Further underscoring the importance of careful scrutiny and the resolution of any doubts in favor of the right to a jury in this analysis is that "[d]etermining which actions belonged to law and which to equity for the purpose of delimiting the jury trial right continues to be one of the most perplexing questions of trial administration." 9 Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2302 (2d ed.) (1995).

**6.** In *Design I,* the Court granted summary judgment dismissing Design's claims for

breach of employment agreements, conspiracy to breach fiduciary duties, and interference with employment. In addition, in a Decision and Order dated January 21, 2005, the Court granted Defendants' motion *in limine* for an order precluding Design from asserting or presenting evidence concerning damages allegedly arising from the failure of a proposed sale of Design stock to nonparty COMSYS Information Technology Services, Inc. *See Design Strategies, Inc. v. Davis,* 355 F.Supp.2d 715 (S.D.N.Y.2005).

2002 WL 989460, at *3 (quoting *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98 Civ. 6907, 2001 WL 863552, at *4 (S.D.N.Y. July 27, 2001) (*"Page Mill"*)); *Restatement (First) Restitution* introductory note to part 1, at 9 (1937) ("[E]quity still retains jurisdiction over nearly all situations involving a breach of a fiduciary duty.").

Nonetheless, that common law touchstone is not necessarily dispositive in this case. To resolve the matter two significant considerations must be examined: the nature of (1) the underlying action giving rise to the alleged breach of fiduciary duties, and, as indicated above, (2) the claim for relief asserted. Concerning the first ground, at least two circuits, and some courts in this District, have stated that "when a breach of fiduciary duty claim is predicated upon underlying conduct 'which is actionable in a direct suit at common law,' the jury should decide whether there has been a breach of fiduciary duty." *Page Mill*, 2001 WL 863552, at *4 (quoting *DePinto v. Provident Sec. Life Insur. Co.*, 323 F.2d 826, 837 (9th Cir.1963); citing, *inter alia, Halladay v. Verschoor*, 381 F.2d 100, 109 (8th Cir. 1967); *In re Evangelist*, 760 F.2d 27, 31 (1st Cir.1985)). The First Circuit, for example, has explained that "[c]onduct that breaches a fiduciary duty might also violate other legal rules; it might constitute a tort (such as fraud) or breach of contract." *In re Evangelist*, 760 F.2d at 31.

Courts within the Second Circuit disagree regarding whether or not it is appropriate, in determining whether an action is legal or equitable for Seventh Amendment purposes, to look beyond a claim for breach of fiduciary duty for underlying legal claims.[7] Pursuant to the principle that, in the Seventh Amendment analysis, all doubts must be resolved in favor of the party seeking a jury trial, the Court will assume for the limited purpose of deciding the question presented here, that a breach of fiduciary duty claim may be construed as legal if it is predicated on an underlying legal theory of liability and, as remedy, seeks monetary damages to compensate plaintiff's alleged losses. Since, as noted above, the Court concludes that a jury trial is not warranted in this case for independent reasons, it is not necessary for the Court to rule on this question. Thus, in the following discussion, the Court assumes, without deciding, that it is appropriate in this case to look beyond the Breach of Fiduciary Duties Claims to determine whether or not they rely upon a legal theory of liability.

Viewed in the light most favorable to Design, Davis's fiduciary duties to Design may be construed as derivative of his employment relationship with Design. From this perspective, it follows logically that, "[a]bsent the [employment] relationship between the parties, there would be no duty to be breached, no wrong, and, thus, no cause of action." *Western Elec. Co. v. Brenner*, 41 N.Y.2d 291, 392 N.Y.S.2d 409, 360 N.E.2d 1091, 1094 (1977). Under some circumstances giving rise to fiduciary duties that are equitable in nature, "[t]he

---

7. While *Page Mill* endorses this approach, *Pereira* rejects it. The *Pereira* court explained that cases that have construed breach of fiduciary duty claims as legal "recognize[ ] a 'dual aspect' to the suit: 'the alleged breach of fiduciary obligation, which is a traditionally equitable matter, and the underlying claim giving rise to the breach, which, if legal, carried the right to a jury trial.' " *Pereira*, 2002 WL 989460, at *3 (quoting *In re Lands End Leasing Inc.*, 193 B.R. 426, 433 (Bankr.D.N.J. 1996)). *Pereira* rejected this view on the grounds that, if accepted, "it [would be] difficult to imagine that *any* breach of fiduciary duty claim would not be premised on some action that could be tried at law and parties seemingly would be entitled to a jury trial on any and all breach of fiduciary duty claims." *Id.* (emphasis in original). The Second Circuit has not addressed this issue.

employer-employee relationship [itself] is one of contract, express or implied." *Id.* (citations omitted). Therefore, a breach of fiduciary duty cause of action premised on the existence of such a relationship may be construed as "essentially contractual." *Id.* Just as in *Page Mill* the plaintiff's "alleged breach of fiduciary duty [was] predicated upon an alleged breach of indenture, a legal claim," *Page Mill,* 2001 WL 863552, at \*4, in this case, Defendants' alleged breach of fiduciary duty derives from Davis's alleged violations of obligations that stem from his employment relationship.

In *Design I,* Design claimed that certain documents and other related evidence contained terms "expressly stipulated and agreed" between Design and Davis that constituted a written employment contract. According to Design, that agreement created an explicit restrictive covenant or non-compete duty. Davis's breach of that contractual obligation allegedly gave rise to Design's demand for compensatory damages flowing from the diversion of the Contentville project. The Court found that the record did not sufficiently establish the existence of an express written contract embodying the specific terms Design asserted or a basis for the damages it claimed. *See Design I,* 2004 WL 1394327, at \*7.

That is not to say, however, that no employment relationship between Design and Davis existed grounded on implied contract principles and otherwise giving rise to whatever implied fiduciary duties the law recognizes to be associated with a relationship so legally rooted. Though the Court acknowledged that, for the purposes of Design's unfair competition and unjust enrichment claims, Design's employment relationship with Davis created certain implied common law duties, *see id.,* it did not specifically elaborate to what extent implied contract theory may be relevant in

connection with this narrower purpose. "A contract implied in fact may result as an inference from the facts and circumstances of the case although not formally stated in words ... and is derived from the 'presumed' intention of the parties as indicated by their conduct." *TMS Entertainment Ltd. v. Madison Green Entertainment Sales, Inc.,* No. 03 Civ. 0517, 2005 WL 476663, at \*5 (S.D.N.Y. Feb. 28, 2005) (quoting *Jemzura v. Jemzura,* 36 N.Y.2d 496, 369 N.Y.S.2d 400, 330 N.E.2d 414, 420 (1975) (internal quotation marks omitted)).

Davis's conduct of carrying out tasks in connection with his employment at Design for a period of more than fourteen years and Design's conduct of continuously providing Davis with monetary compensation during that period could be read to demonstrate an intention by the parties to form an employment relationship and to be mutually bound by the terms of such rights and duties as their business conduct and dealings reasonably suggested or the law implied. As noted by one court, "[a]ll employer-employee relationships not governed by express contracts involve some type of implied contract of employment. There cannot be any serious dispute that there is a bargain of some kind; otherwise, the employee would not be working." *Franco v. Yale University,* 238 F.Supp.2d 449, 453 (D.Conn.2002) (citations omitted).

A contract implied in fact "is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Jemzura,* 369 N.Y.S.2d 400, 330 N.E.2d at 420 (citing *Matter of Ahern v. South Buffalo Ry. Co.,* 303 N.Y. 545, 104 N.E.2d 898, 906–907 (1952), *aff'd,* 344 U.S. 367, 73 S.Ct. 340, 97 L.Ed. 395 (1953)). *See also* 17 *Am.Jur.2d Contracts* § 12 (2004). "General contract law recognizes

and enforces 'implied-in-fact' contracts." *Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers' Int'l Union of Am.*, 28 F.3d 347 (3rd Cir. 1994). Therefore, again interpreting the pleadings in the light most favorable to Design for purposes of determining whether or not it has a right to a jury on Design's Breach of Fiduciary Duties Claims, the Court concludes that those claims may be construed as contractually grounded, and hence legal. *See Terry*, 494 U.S. at 570, 110 S.Ct. 1339; *Brown v. Sandimo Materials*, 250 F.3d 120, 126 (2d Cir.2001) ("[A] claim for breach of contract . . . has historically been uniformly treated as a legal claim.") (citations omitted).

■ The Court will next consider whether Design's causes of action for unfair competition and unjust enrichment should be construed as equitable or legal in this case. Given the particular nature of those causes of action, as asserted in this case, the Court concludes that, even though they are construed as equitable in some circumstances,[8] based on the same principles and reasoning stated above, and again resolving all doubts in favor of Design, they may be viewed as derivative of an underlying legal obligation in this case.[9]

8. *See, e.g., Protexol Corp. v. Koppers Co.*, 12 F.R.D. 7, 8–9 (S.D.N.Y.1951) (stating that claims based on unfair competition are "essentially equitable in nature. Injunctions are asked, and, in keeping with equity's object to grant complete relief, an accounting. Claims such as those here set forth are not triable by jury at common law and do not come within the purview of . . . the Seventh Amendment of the Constitution."); *Webb v. RLR Assoc., Ltd.*, No. 03 Civ. 4275, 2004 WL 555699, at *3 (S.D.N.Y. Mar.19, 2004) (noting that claims for unjust enrichment are "grounded in equity").

9. Many courts, including the Supreme Court, have characterized unfair competition as a common-law tort action, *see, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 147, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) ("The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source."); *Reproducta Co., Inc. v. Kellmark Corp.*, No. 92 CIV. 9362, 1994 WL 719705, *5 (S.D.N.Y. Dec.27 1994) (describing the "common law tort of unfair competition, [as] a tort involving the misappropriation for commercial advantage of a benefit or property right belonging to another.") (citation and internal quotation marks omitted). The particular form of unfair competition asserted by Design, however, does not appear to share this ancestry. In the case of Design, to the extent that any deceit is asserted, it would be in relation to Design, not potential consumers. Moreover, the alleged competition would be rendered unfair by the nature of the parties' fiduciary relationship, rather than by a non-fiduciary's unauthorized use of a competitor's trademark, for instance. In the latter case, the injustice stems from one party taking "the skill, expenditures and labors of a competitor and misappropriat[ing] for the commercial advantage of one person . . . a benefit or property right belonging to another," *Roy Export Co. Establishment v. Columbia Broadcasting Sys.*, 672 F.2d 1095, 1105 (2d Cir.1982) (alteration and omission in original) (citations and internal quotation marks omitted), rather than from the alleged competitor contravening a duty of loyalty.

Even if the unfair competition claim asserted here is analogous to a tort action for deceit at common law, it is not immediately clear what implications that conclusion would have for the claim's equitable or legal character. According to some courts, the common law "tort [of unfair competition] developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection." *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3rd Cir.1995). From this point of view, the tort would seem to be best classified as equitable. On the other hand, other courts have described common-law tort claims as "historically legal in nature." *Beckett v. Atlas Air, Inc.*, 968 F.Supp. 814, 825 (E.D.N.Y.1997) (citation omitted). *Cf. Restatement (First) of Restitution* § 128 (1937) ("'Tortiously' refers to such wrongful conduct as gives rise to a civil action *either at law or in equity* under the principles of the law of torts.") (emphasis added).

In the absence of the implied-in-fact employment relationship barring unfaithful employment behavior, there would be no basis on which to assert that Davis's allegedly competitive conduct was unfair or that his alleged enrichment was unjust, and hence neither would be actionable. For these reasons, the Court concludes that Design's remaining claims are arguably legal. The Court thus turns to the second consideration referred to above as determinative of the right to a jury trial: the claim for relief demanded.

### 2. *Remaining Remedies Sought by Design*

■ Although the Court concludes, as explained above, that Design arguably asserted a claim for legal relief in the form of lost profits in the Complaint, Design has forfeited its right to proceed with any such claim due to its own discovery failures. The Court will now explain the basis for its finding that Design had arguably asserted a claim for lost profits in its Complaint and the reasoning behind its conclusion that the existence of such a claim would have entitled Design to a jury trial. In addition, the Court will explain the basis for its conclusion that the other remaining remedies sought by Design are most appropriately construed as equitable, thereby rendering Design's remaining claims, considered in both their substantive and remedial aspects, equitable.

Prior to the issuance of the Court's February 16th Order, Design argued in its submissions in support of its right to a jury trial that certain of its remaining claims "seek[ ] damages to compensate for the appropriation of Design's corporate opportunities and the diversion of corporate

assets," as well as for Defendants' unjust enrichment. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Strike Jury Demand (undated) ("Design Jury Demand Mem.") at 3 & 5.) According to Design, it was entitled to a jury trial because "an award of money would fairly compensate [it]" for Defendants' alleged wrongs. (Design Jury Demand Mem. at 5.)

In response, Defendants contended that "[t]he fact that Design requests monetary 'damages' is not determinative," (Defendants' Joint Reply Memorandum in Support of their Motion to Strike Plaintiff's Jury Demand dated February 9, 2005 ("Defts. Jury Demand Reply Mem.") at 1), because "monetary damages may be considered equitable when 'the damages sought are in the nature of restitution as in actions for disgorgement of improper profits or money wrongfully withheld.' " [10] *Webb*, 2004 WL 555699, at *2 (quoting *Swan Brewery Co. v. U.S. Trust Co.*, 143 F.R.D. 36, 41 (S.D.N.Y.1992)).

The Supreme Court has described compensatory damages as "the classic form of legal relief." *Mertens v. Hewitt Associates*, 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). *See also Curtis v. Loether*, 415 U.S. 189, 197, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (noting in the context of a claim under the Civil Rights Act of 1968 that "there is surely no basis for characterizing the award of compensatory and punitive damages here as equitable relief."); *Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.*, 285 F.Supp.2d 382, 388 (S.D.N.Y.2003) (noting that "compensatory damages, even if they resulted from a breach of fiduciary duty, are not

---

**10.** Some scholars reject the view, implied by the court in *Webb*, that restitution constitutes a form of damages. "For these scholars, the term 'damages' has a narrower meaning than monetary relief in general and should be lim-

ited to recovery based on plaintiff's loss or recovery of punitive damages." Colleen P. Murphy, *Misclassifying Monetary Restitution*, 55 SMU L.Rev. 1577, 1586 (2002).

recoverable as equitable relief ....") (citing, *inter alia, Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 212–16, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)). Therefore, to the extent that any of Design's remaining claims sought compensatory damages and, as a result, qualified as legal claims, the Court concluded that Defendants' motion to strike Design's jury demand should be denied as to those claims.

In its Complaint, Design characterizes the remedy it seeks for the Breach of Fiduciary Duties Claims as "particular monetary damage, in an amount to be determined at trial but in no event believed to be less that Twenty–Five Million ($25,000,000.00) Dollars." (Compl.¶¶ 35, 49, 52.) In count one of the Complaint, where Design alleges that Davis breached express written employment agreements—a claim that was dismissed on summary judgment—Design indicates that the sum of twenty-five million dollars is intended to refer to the amount of money that it would have made had it been awarded the Contentville contract. With respect to its claim alleged in count one, Design states that it "suffered particular monetary damage, in an amount to be determined at trial, but believed to be in excess of Twenty-five Million ($25,000,000.00) Dollars in *lost revenues."* (Compl. ¶ 33 (emphasis added).) Lost revenues are a form of compensatory damages. *See Paul T. Freund Corp. v. Commonwealth Packing Co.,* 288 F.Supp.2d 357, 360–361 (W.D.N.Y. 2003) (referring to lost profits as a component of compensatory damages); 4A Robert L. Haig, *New York Practice* § 64:36 (2d ed. 2004) ("Lost profits are an element of compensatory damages."); 3 Robert L. Haig, *Business & Commercial Litigation in Federal Courts* § 39.3 (2004) ("Various elements of compensatory damages include lost profits, lost business opportunities."). Accordingly, the Court concluded that, insofar as any of Design's remaining counts

sought this remedy, those claims were arguably legal in nature and warranted a jury trial.

Although the express contract count in relation to which Design explicitly claims lost revenues was dismissed, the references to the same monetary sum in relation to the Breach of Fiduciary Duties Claims may reasonably be interpreted to refer to lost revenues. The Complaint contains no indication that this sum is intended to quantify any other type of damages. In addition, each remaining count that claims damages in this sum incorporates by reference the allegations in all of the preceding paragraphs, and hence incorporates count one's reference to the twenty-five million dollars as "lost revenues." Finally, in the introduction to its Complaint, Design lists among the remedies it seeks "an award of compensatory damages." (Compl.¶ 1.)

Although Design does not specifically list compensatory damages or lost revenues in the complaint's *ad damnum* clause, it does list "damages" there. (Compl. at 20.) Given that "ambiguities and inelegancies in a pleading will not defeat a demand for a jury trial so long as it reasonably appears that the substance of what is pleaded constitutes a claim for relief at law," *Robine v. Ryan,* 310 F.2d 797, 798 (2d Cir.1962) (citing *Dairy Queen,* 369 U.S. at 476–477, 82 S.Ct. 894), it is reasonable to interpret the Complaint as seeking compensatory damages, in the form of lost revenues, in relation to Design's Breach of Fiduciary Duties Claims.

For these reasons, and given that all doubts with respect to a party's demand for a jury trial must be resolved "in favor of the right to a jury trial," *Lee Pharmaceuticals,* 526 F.2d at 1117, the Court determined in its February 16th Order that a jury trial was warranted in this case to the extent that Design's remaining claims

sought compensation in the form of damages under the legal remedy of lost profits.[11] As explained above, however, because the Court has ruled that Design may not proceed with its lost profits claims due to its discovery failures, the asserted remedy of compensatory damages is no longer available as a basis on which to grant Design a jury trial.

■ The other remedies Design seeks, as stated in the Complaint, are a permanent injunction, an accounting, punitive damages, restitution, the imposition of a trust, and attorneys' fees and costs. Whether these remedies are legal or equitable turns on whether or not they "were *typically* available in equity." *Knudson*, 534 U.S. at 210, 122 S.Ct. 708 (emphasis in original). Thus, the category of equitable relief is narrower than "whatever relief a court of equity is empowered to provide in the particular case at issue (which could include legal remedies that would otherwise be beyond the scope of the equity court's authority)." *Id.* (quoting *Mertens*,

508 U.S. at 256, 113 S.Ct. 2063 (internal quotation marks omitted)).

There does not appear to be any significant argument that Design's claims for an injunction, punitive damages, or attorneys' fees and costs in the present context entitle Design to a jury under the Seventh Amendment. *See id.* at 211 n. 1, 122 S.Ct. 708 ("[I]njunction is inherently an equitable remedy." [12]) (citations omitted); *Webb*, 2004 WL 555699, at *3 n. 3 "[t]he fact that [a party] seeks punitive damages 'does not change the nature of [its] claim to a legal one.'" (quoting *Hodges v. Virgin Atlantic Airways, Ltd.*, 714 F.Supp. 75, 77 (S.D.N.Y.1988)); *Daisy Group, Ltd. v. Newport News, Inc.*, 999 F.Supp. 548, 549 (S.D.N.Y.1998) (noting that plaintiff did "not dispute that its claims for injunctive relief and attorneys' fees are equitable in nature and do not entitle it to a jury trial."). Design's other remaining remedies, however, are less categorical and, though often characterized as equitable, may entitle a party to a jury in some cases.

---

**11.** Even if the causes of action underlying Design's Breach of Fiduciary Duties Claims were characterized as equitable, it would still be arguable that the legal nature of one of the compensatory damages remedies sought by those claims renders them legal for Seventh Amendment purposes. *See Resnick v. Resnick*, 763 F.Supp. 760, 767 (S.D.N.Y.1991) ("[T]he Second Circuit has stated that '[a]lthough fiduciary relationships have equitable underpinnings,' a court should look to the nature of the relief sought to determine whether an action that is framed as a claim for breach of fiduciary duty is legal or equitable in nature.") (quoting *Spector v. Mermelstein*, 485 F.2d 474, 482 n. 8 (2d Cir.1973)); Dan B. Dobbs, *Law of Remedies* 156 n. 10 (2d ed. 1993) ("A money judgment claim for a specific amount is a common law claim even though it is brought against one who breaches a fiduciary duty or the like.").

**12.** In characterizing injunction as an inherently equitable remedy, the Supreme Court in

*Knudson* specified that, nevertheless, "any claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction." *Knudson*, 534 U.S. at 211 n. 1, 122 S.Ct. 708. The Court also explained that "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity." *Id.* at 210–211, 122 S.Ct. 708 (citing *Restatement (Second) of Contracts* § 359 (1979)); 3 Dobbs, *supra*, § 12.8(2), at 199; 5A A. Corbin, *Contracts* § 1142, p. 119 (1964). Thus, as noted above, it is important to consider the context surrounding a claim to injunctive relief in determining whether or not the specific claim in question is legal or equitable. In this case, Design seeks an injunction requiring Davis and others to refrain from engaging in certain acts, such as "using Design documents and ... confidential information ... in competition with Design." (Compl. at 21), and hence is not merely a claim for money construed in terms of an injunction.

■ The remedy of a constructive trust, which "compel[s] the defendant (or the bank) to place the fund [in question] in the plaintiff's name, ... is almost always regarded as equitable in nature...." Dobbs, *supra*, § 2.6(3), at 157. Similarly, a claim for an accounting, which is based on allegations that the "defendant (often a fiduciary) has profited by using something which in good conscience belongs to the plaintiff and that the defendant ought to disgorge his profits," also is "usually regarded as equitable." [13] *Id.* at 158. In the case of restitution, the Supreme Court has stated that it "is a legal remedy when ordered in a case at law and an equitable remedy ... when ordered in an equity case, and whether it is legal or equitable depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought." *Knudson*, 534 U.S. at 213, 122 S.Ct. 708 (quoting *Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th Cir.1994)) (internal quotation marks and further citations omitted). [14]

Unlike Design's claim for lost profits, these remedies do not aim to compensate Design for damages it suffered in the form of monetary gains it would have earned, in other words, funds it allegedly would have acquired had Davis not breached his fiduciary duties. Rather, the relief demanded

---

**13.** Nevertheless, "if the ultimate award in the accounting is merely a non-coercive money judgment, the accounting claim might be thought to require a jury trial." Dobbs, *supra*, § 2.6(3), at 158. Thus, in *Dairy Queen*, the Supreme Court found that the plaintiffs' request for "an accounting to determine the exact amount of money," *Dairy Queen*, 369 U.S. at 475, 82 S.Ct. 894, owed to them was a legal remedy. In that case, however, the basis of liability was that the defendants had breached a specific term of a written licensing agreement by "defaulting on the contract's payment provisions." *Id.* at 474, 82 S.Ct. 894. As the Court explained, the plaintiffs did not claim that the defendants must turn over funds that were unjustly possessed, but that the plaintiffs were "entitled to recover whatever was owed to them under the contract.... As an action on a debt allegedly due under a contract, it would be difficult to conceive of an action of a more traditionally legal character." *Id.* at 476–477, 82 S.Ct. 894. Although, as explained above, Design's remaining claims arguably may be classified as legal, insofar as they are predicated on the breach of an implied-in-fact employment contract, that does not entail that the accounting sought here must be construed as legal. As explained further below, unlike the plaintiffs in *Dairy Queen*, Design does not seek to recover "debt allegedly *due* under a contract," *id.* (emphasis added), but to recover Defendants' *gains* insofar as they were acquired in connection with a breach of contract. In other words, there is no claim here that Defendants owe Design a debt—only that they

possess funds that, in good conscience, they should not have acquired.

The remedy of accounting is sometimes described as a species of restitution. *See, e.g., In re Evangelist*, 760 F.2d at 29–30 ("Like other remedies of restitution, ... [an accounting] requires one owing a fiduciary duty to pay to the beneficiary of that obligation—to 'disgorge'—money taken in derogation of the duty.") (citing, *inter alia, Curtis*, 415 U.S. at 197, 94 S.Ct. 1005).

**14.** A strict application of this principle concerning the nature of restitution might be interpreted to support the inference that the restitution sought here must be classified as legal, insofar as the underlying claim is characterized as legal (to the extent that it is viewed as contractual). Such an inference, however, would disregard or presume a substantial exception to the principle, also relied upon by *Knudson*, that the nature of a remedy is determined by whether or not it was typically available at equity, as well as the general rule that, for Seventh Amendment purposes, the nature of the remedy sought is more important than the nature of the substantive cause of action in determining the overall equitable or legal nature of a claim. In the absence of any binding authority indicating the *Knudson* Court intended such a result, and in light of the considerations, elaborated herein, weighing strongly in favor of an interpretation of Design's remaining claims as equitable, the Court concludes that the inference referred to above is not warranted.

seeks to remove from Defendants the funds that they allegedly obtained unjustly and that in good conscience should be turned over to Design. For this reason, this form of recovery is "measured by the defendant's gain rather than the plaintiff's loss...." Murphy, *supra*, at 1589. Such inequitable gain typically inures to defendant either from direct wrongful appropriation or use of property actually belonging to plaintiff, or from improper dealings with third parties from which defendant derives benefits that in good conscience should accrue to plaintiff.

Thus, the conceptual basis for Design's claim for restitution of the gain in question is not that the funds are *owed* to it by Defendants under an established legal duty, in the sense that Design was entitled to and anticipated receiving that money—based, for example, on its fulfillment of a contractual obligation—but did not receive it by reason of Defendants' breach. Instead, the conceptual basis of Design's claim is that "in equity and good conscience [Defendants] ought not to retain" the funds in question. *Ross v. F.E.I., Inc.*, 150 A.D.2d 228, 541 N.Y.S.2d 400, 403 (N.Y.App.Div.1989) (quoting *Simonds v. Simonds*, 45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978)) (internal quotation marks omitted). This is the converse of the situation in *Knudson*, where the Supreme Court found the petitioners' claim to be legal. As the Court explained, "[t]he basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred." *Knudson*, 534 U.S. at 214, 122 S.Ct. 708 (emphasis in original). The Court concluded from this that "[t]he kind of restitution that petitioners seek ... is not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits that they

conferred upon respondents." *Id.* Because, in the instant case, the remedies of an accounting, a constructive trust, and restitution seek to restore funds to Design on the grounds that Defendants do not possess them in good conscience, those remedies are, under these circumstances, more appropriately classified as equitable than legal. In the context of this case, these are remedies that "were *typically* available in equity." *Knudson*, 534 U.S. at 210, 122 S.Ct. 708 (emphasis in original).

Further supporting characterization of the remedies of an accounting, a constructive trust, and restitution as equitable in this case is that, at least in part, they "seek[ ] to trace [Design's] property into another form or into the hands of a third person." Murphy, *supra*, 1604. Design's claim, labeled "Restitution/Unjust Enrichment," demands as relief that Davis be compelled to restore to Design:

> an amount not less than the sum of (a) the value of all confidential information taken and/or used and disclosed by Mr. Davis, (b) the total compensation Mr. Davis or any entity in which he is a principal, or with which he is or was associated, have received and will receive, directly or indirectly, for any transactions commenced prior and subsequent to his resignation from Design, with any customer or prospective customer of Design, which belonged to Design, had the Defendants not diverted the corporate opportunity from Design, and (c) the total compensation paid by Design to Mr. Davis since he first engaged in such conduct.

(Compl.¶ 41.) Because Design seeks in part to trace, and have paid over to Design, profits from any corporate opportunities that Davis allegedly misappropriated and that he and the IT Defendants earned as a result of having exploited those transactions, the appropriate remedy would en-

tail impressing a constructive trust or equitable lien to Design's benefit over any proceeds of those dealings. A constructive trust, unlike remedies typically characterized as legal, such as compensatory damages, enables a plaintiff "to follow or trace the proceeds of the original property." 4 *Causes of Action*, 569, § 29 (2004).

For these reasons, the Court concludes that Design's remaining claims (which no longer include any claims seeking compensatory damages in the form of lost profits) should be construed as equitable in nature.[15] Accordingly, the Court reaffirms its conclusion that Design's only basis for a right to a jury trial was its claims for lost profits. Because Design forfeited its right to litigate that claim at trial by failing to provide adequate discovery with respect to it, there is no longer any basis on which Design may correctly claim to be entitled to a jury.[16]

This conclusion applies with equal force to Design's claim for restitution of any compensation Davis received from Design during the period of alleged disloyalty, despite the fact that this remedy may not require tracing of funds and may ultimately seek only to compel Davis to remit to Design a particular sum of money. To the extent Design demands that Davis restore compensation paid to him during the period of his alleged wrongful conduct, the relief sought would not derive from any loss Design actually suffered, or for which it has asserted an express legal right. In fact, insofar as Design and Davis maintained an employment relationship, it is fair to infer that Design was legally obligated to pay Davis such compensation as the terms of their agreements and dealings called for. It is not the case, however, that an implicit term of any such employment relationship would necessarily entitle Design to forfeiture by Davis of all compensation paid after any one act of misconduct. Rather, if warranted, such a remedy would derive from equity's powers, which possess a punitive aspect, to prevent defendant from retaining ill-gotten gains and not profiting from wrongful conduct, even if legally the offender may have arguable entitlement to or possession over the matter in contention. *See Phansalkar*, 344 F.3d at 200 (explaining that a principal's right to recover compensation paid to a disloyal agent is derived from New York's faithless servant doctrine); *Webb*, 2004 WL 555699, at *2 (stating that a "claim under the faithless servant doctrine is a claim in equity.").

### C. MOTION TO PRECLUDE TESTIMONY OF JOEL REDESKY AND JOHN DOUGHTY

■ In its proposed pretrial order, Design lists among its witnesses Joel Redesky ("Redesky") and John Doughty

---

**15.** In reaching this conclusion, the Court is cognizant of the observation by one scholar that, "[i]n the context of determining whether a right to a jury trial exists, expansive and inaccurate definitions of restitution have led courts to deny the constitutional right to a jury trial." Murphy, *supra*, at 1634.

**16.** Design cites the Second Circuit's decision in *Robine v. Ryan*, 310 F.2d 797 (2d Cir. 1962), in support of its contention that its claim for unjust enrichment and restitution is legal in nature. In that case, the court stated that "[a]llegations that a party has been injured by another's wrongful appropriation to his own use of an invention divulged in reliance on a confidential relationship state a legal cause of action when the relief requested is damages in a specified sum." *Robine*, 310 F.2d at 798 (citations omitted). Thus, the claim at issue in *Robine* may be distinguished from the instant case on the grounds that the relief there sought compensatory damages calculated on the basis of plaintiff's loss, rather than, as here, restitution of the proceeds of Defendants' unjust gains, the bulk of which Design asserts may be in the hands of third parties and would have to be traced to those sources.

("Doughty"). Design represents that Redesky is an accountant employed by Design and proffers him as a witness to testify about Design's lost profits resulting from Davis's alleged diversion of Contentville, Davis's remuneration from Design during the period of alleged disloyalty, and the alleged overpayment of commissions to Davis during that period. Design represents that Doughty is an owner of Software Guidance Associates and proffers him as a witness to testify about the nature of the solutions and staffing businesses.

Defendants argue that Design should be precluded from calling Redesky and Doughty as witnesses because they were not timely disclosed and because Design has not submitted the necessary documentation in support of their qualifications as experts concerning the subjects of their proposed testimony. Design acknowledges that it did not provide Defendants with notice of these witnesses until February 15, 2005, or eighty days before the trial date, in violation of Federal Rule of Civil Procedure 26(a)(2)(C) ("Rule 26(a)(2)(C)"). Rule 26(a)(2)(C) provides that parties must disclose the identity of proposed expert witnesses and provide evidence of their qualifications as experts at least ninety days before the trial date, in the absence of other directions from the court or a stipulation by the parties. Thus, Design missed the ninety-day deadline by ten days.

Design argues that its failure to timely disclose its intent to proffer Redesky and Doughty as witnesses was harmless "in view of the length of time that has elapsed since the disclosure of these names." (Letter to the Court from Jack Dweck of 3/18/05) at 4 ("Dweck Letter"). In response, Defendants claim that they would "be severely prejudiced by the reopening

of discovery and the need for expert discovery on both sides," that "[t]here is no reason why discovery should be reopened, and there is no merit to having defendants take the experts' depositions until [defendants] know if they will be allowed to testify and until they have produced their reports." (Letter to the Court from Leonard Benowich of 3/22/05 ("Benowich Reply Letter") at 2.)

As a preliminary matter, it is unclear whether or not Design intends to offer Redesky as an expert. (*See* Dweck Letter at 2 ("While Mr. Redesky is a Certified Public Accountant, his testimony is not necessarily that of an expert witness.").) Assuming that Design does not intend Redesky to testify as an expert, such that the rules governing disclosure of expert witnesses are not relevant, the Court concludes that he may testify concerning Davis's allegedly unearned commissions and his remuneration during the period of alleged disloyalty.[17]

The record before the Court indicates that there has been sufficient notice of Design's intent to seek restitution of these funds and sufficient discovery concerning them so that permitting Redesky to provide purely factual testimony on these matters would not be unduly prejudicial. The fifth cause of action in the Complaint, for restitution and unjust enrichment, seeks "the total compensation paid by Design to Mr. Davis" during the period of alleged disloyalty. (Compl.¶ 40.) The Court finds that the phrase "total compensation" is sufficiently broad that it may reasonably be read to include commissions.

In addition, Design's response to the IT Defendants' request, in their first set of interrogatories, for a statement of Design's alleged financial losses explicitly refers to

---

17. Design does not object to the admission of Redesky's testimony concerning Davis's remuneration in general, but only to his testimony concerning overpayment of commissions.

commissions paid to Davis. (*See* Pl.'s Resp. at 6.) Finally, Davis's first request for production of documents specifically requests documentation of commissions paid to Davis. (*See* Defendant Davis' First Request for Production of Documents dated November 2, 2002 at 3.) Given that there has been discovery on the issue of commissions paid to Davis, the Court concludes that Redesky may provide factual testimony as to those commissions. Redesky may not, however, for the reasons stated above, testify as to lost profits.

■ Design does not deny that it has proffered Doughty as an expert witness. Nor does it offer any explanation of why it has not complied with the requirements of Rule 26(a)(2)(C). Design only states that "no expert report has ever been received or requested by [Design], thus, none could be furnished to the Defendants." (Dweck Letter at 5.) The burden under the discovery rules, however, is on the party proffering the witness to obtain and submit an expert report. Without such a report and the additional materials required by Rule 26(a)(2)(C), it is impossible for the Court to determine whether or not Doughty qualifies as an expert witness and hence whether or not his testimony is admissible.

In addition, there is no indication that there has been discovery specifically concerning the subject of Doughty's proffered testimony, even if it has been addressed to some extent in depositions. As noted above, discovery closed approximately one and a half years ago. To reopen discovery to address a new subject and to require Defendants to investigate Doughty's qualifications as an expert at this late date would prejudice Defendants and unduly delay a final resolution of this matter.

Finally, given Design's own contention that it has "engaged extensively in both solutions and staffing work throughout the years of its existence," (Dweck Letter at 2), it is unclear why the testimony of Marsh Newmark, Design's president, whom Defendants have deposed and who was listed as a potential witness in Design's initial disclosure statement, could not adequately address the issue of the difference between these areas. For these reasons, the Court concludes that Doughty may not testify in this case.[18]

Accordingly, it is hereby

**ORDERED** that the Court's Order dated February 16, 2005 denying the motion of defendants Marc E. Davis ("Davis"), Info Technologies, Inc., Info Technologies Web Solutions, and John Goullet (collectively the "IT Defendants," and together with Davis, "Defendants") to strike the demand by plaintiff Design Strategies, Inc. ("Design") for a jury trial in this case is amended to incorporate the above findings, reasoning and conclusions; and it is further

**ORDERED** that Defendants' motion for an order precluding Design from introducing at trial evidence of its alleged lost profits is GRANTED; and it is further

**ORDERED** that Defendants' motion for an order precluding Design from introducing at trial the testimony of Joel Redesky ("Redesky") is GRANTED as to Redesky's proposed testimony concerning Design's alleged lost profits and DENIED as to Redesky's factual testimony concerning the alleged overpayment of commissions to

---

**18.** Given that Defendants have moved to preclude Doughty's testimony and that the Court held a telephone conference on this matter, it is not necessary to invoke Rule 37(c)(1)'s automatic sanction in order to preclude Doughty's testimony. Rather, Rule 37(c)(1) provides that "[i]n addition to or in lieu of [the automatic sanction], the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." The Court precludes Doughty's testimony in an exercise of this discretion.

Davis, to the extent that there has been discovery concerning those commissions; and it is further

**ORDERED** that Defendants' motion for an order precluding Design from introducing at trial the testimony of John Doughty is GRANTED.

**SO ORDERED.**